UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; and ASMI AUTO INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| SPINE SPECIALISTS OF MICHIGAN, P.C.; MICHIGAN AMBULATORY SURGICAL CENTER, LLC; ANESTHESIA SERVICES AFFILIATES, P.L.L.C.; CENTRAL HOME HEALTH CARE, INC.; NORTH AMERICAN LABORATORIES L.L.C.; and LOUIS RADDEN, D.O., | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company (hereinafter, "Allstate" and/or "plaintiffs") hereby allege as follows.

1

## I.   <u>INTRODUCTION</u>

1.     This is a case about a medical clinic, an ambulatory surgical facility, an anesthesia provider, a home healthcare provider, a drug testing laboratory, and their owner/manager who abused the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101*, et seq*., by engaging in a scheme to defraud Allstate by submitting false and fraudulent medical records, bills, and invoices through the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were billed at excessive rates.

2.     Defendants Spine Specialists of Michigan, P.C. ("Spine Specialists"); Michigan Ambulatory Surgical Center, LLC ("MASC"); Anesthesia Services Affiliates, P.L.L.C. ("Anesthesia Services"); Central Home Health Care, Inc. ("CHHC"); North American Laboratories L.L.C. ("NA Labs"); and Louis Radden, D.O. ("Radden") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to the defendants.

4.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6.      As a result of the defendants' fraudulent acts, Allstate has paid millions of dollars to them related to the patients at issue in this Complaint.

## II.    PARTIES

### A.    PLAINTIFFS

7.      Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company are each a company duly organized and existing under the laws of the State of Illinois.

8.      Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company each have their respective principal places of business in Northbrook, Illinois.

9.      At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

3

B.   <u>DEFENDANTS</u>

1.   <u>Spine Specialists of Michigan, P.C.</u>

10.   Defendant Spine Specialists of Michigan, P.C. is a professional corporation organized under the laws of the State of Michigan.

11.   Spine Specialists also uses the registered fictitious name "SSM Pharmacy."

12.   Spine Specialists's principal place of business is located in Bingham Farms, Michigan.

13.   At all relevant times, Spine Specialists was operated and conducted by defendants MASC, Anesthesia Services, CHHC, NA Labs, and Radden.

14.   Spine Specialists billed Allstate for services not rendered, that were medically unnecessary (to the extent treatment was rendered at all), were fraudulently billed, and were billed at excessive and unreasonable rates in relation to Allstate insureds, including the patients set out in Exhibit 1.

2.   <u>Michigan Ambulatory Surgical Center, LLC</u>

15.   Defendant Michigan Ambulatory Surgical Center, LLC is a limited liability company organized under the laws of the State of Michigan.

16.   MASC also uses the registered fictitious names "Specialty Surgery Center," "Michigan Regional Ambulatory Surgery Center, LLC," and "Synergy Ambulatory Surgery Center, LLC."

4

17.     MASC's member is Radden, who is a citizen of the State of Michigan.

18.     At all relevant times, MASC was operated and conducted by defendants Spine Specialists, Anesthesia Services, and Radden.

19.     MASC billed Allstate for services not rendered, that were medically unnecessary (to the extent treatment was rendered at all), were fraudulently billed, and were billed at excessive and unreasonable rates in relation to Allstate insureds, including the patients set out in Exhibit 2.

### 3.     Anesthesia Services Affiliates, P.L.L.C.

20.     Defendant Anesthesia Services Affiliates, P.L.L.C. is a professional limited liability company organized under the laws of the State of Michigan.

21.     Anesthesia Services's member is Radden, who is a citizen of the State of Michigan.

22.     At all relevant times, Anesthesia Services was operated and conducted by defendants Spine Specialists, MASC, and Radden.

23.     Anesthesia Services billed Allstate for services not rendered, that were medically unnecessary (to the extent treatment was rendered at all), were fraudulently billed, and were billed at excessive and unreasonable rates in relation to Allstate insureds, including the patients set out in Exhibit 3.

### 4.      Central Home Health Care, Inc.

24.      Defendant Central Home Health Care, Inc. is incorporated under the laws of the State of Michigan.

25.      CHHC's principal place of business is located in Southfield, Michigan.

26.      At all relevant times, CHHC was operated and conducted by defendants Spine Specialists, MASC, and Radden.

27.      CHHC billed Allstate for services that were medically unnecessary (to the extent treatment was rendered at all) and were billed at excessive and unreasonable rates in relation to Allstate insureds, including the patients set out in Exhibit 4.

### 5.      North American Laboratories L.L.C.

28.      Defendant North American Laboratories L.L.C. is a limited liability company organized under the laws of the State of Michigan.

29.      Upon information and belief, NA Labs's member is Jennifer Watson, who is a citizen of the State of Michigan.

30.      At all relevant times, NA Labs was operated and conducted by defendants Spine Specialists, MASC, and Radden.

31.      NA Labs billed Allstate for services not rendered that were medically unnecessary (to the extent treatment was rendered at all) in relation to Allstate insureds, including the patients set out in Exhibit 5.

### 6. **Louis Radden, D.O.**

32. Defendant Louis Radden, D.O. is a resident and citizen of the State of Michigan.

33. At all times relevant to this Complaint, Radden operated and controlled defendants Spine Specialists, MASC, Anesthesia Services, CHHC, and NA Labs.

## III. **JURISDICTION AND VENUE**

34. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.*, because they arise under the laws of the United States.

35. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

36. Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

37. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV. **BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD**

38. The defendants used the RICO enterprises discussed herein (namely, Spine Specialists, MASC, Anesthesia Services, CHHC, and NA Labs) to submit

exorbitant charges to Allstate for purported medical services, procedures, and testing that were not actually provided, were not medically necessary, were fraudulently billed, and were billed at excessive and unreasonable rates.

39.     The purpose of the scheme was to generate as many bills as possible, without regard for medical necessity or patient safety, which bills were sent to Allstate using the U.S. Mail.

40.     Radden owns at least three (3) of the defendant clinics, including Spine Specialists, MASC, and Anesthesia Services, thus creating a strong financial incentive to refer patients between the defendant clinics to maximize the total amount of bills submitted to insurers like Allstate.

41.     Patients who claimed to be involved in motor vehicles accidents were often steered to the defendant clinics by providers who engage in illegal solicitation and by layperson personal injury attorneys.

42.     These providers and attorneys knew the defendants routinely engage in excessive billing and assign false diagnoses unsupported by objective medical findings to make patients appear more injured than they actually were (if they were injured at all) thereby inflating the perceived value of insurance claims.

43.     To that end, patients were subjected to a predetermined treatment protocol that was designed to maximize billing and not for patient benefit.

44.     This predetermined treatment protocol included medically unnecessary and excessive procedures and injections that were needlessly administered in surgical suites under general anesthesia, surgeries that lacked objective medical support, unnecessary diagnostic testing, unnecessary post-surgical home therapy, and unnecessary urine drug testing ("UDT"), all of which were billed by defendants Spine Specialists, MASC, Anesthesia Services, CHHC, and NA Labs.

45.     The unnecessary injections and procedures were performed (if at all) at MASC, which allowed MASC to submit additional charges to Allstate for facility fees and Anesthesia Services to submit additional charges to Allstate for anesthesia.

46.     In addition to a battery of medically unnecessary injections, the defendants routinely billed for improper and experimental treatments that had no proven benefit.

47.     Following alleged surgical procedures at MASC, 83% of patients were referred to CHHC for purported in-home healthcare treatment, which billed outrageous rates for nursing services and in-home physical therapy that often was not performed at all and was billed regardless of the severity of patients' alleged injuries or ability to attend far less expensive in-office care (if such care was necessary at all).

48.     Radden is well aware of the impropriety of the exact type of reckless and improper overtreatment of patients described herein.

9

49.     The Michigan Board of Osteopathic Medicine and Surgery (the "Board") has sanctioned Radden for performing epidural steroid injections and facet injections at the same time, providing identical treatment without differentiating anatomical causes, and injecting doses of steroids that far exceed the standard of care.

50.     According to the Board's retained expert, "[t]here is absolutely no indication to perform [epidural steroid and facet] injections at the same visit . . . . Doing multiple injections in the same anatomical location at that same visit is excessive and not supported in any peer-reviewed literature."

51.     As a result, the Board levied charges of incompetence and negligence against Radden by Administrative Complaint, which was resolved through a settlement and Consent Order.

52.     The Board's allegations against Radden are largely similar and directly relevant to the improper treatment described herein.

53.     For example, Spine Specialists, MASC, and Radden routinely billed for spinal injections that were physically impossible and had no anatomic explanation.

54.     As detailed below, patients at issue herein were routinely subjected to invasive injections that had no relationship to their alleged subjective complaints of pain or to any objective diagnostic test findings.

55.     That the defendants' bills were motivated solely by financial gain and had nothing to do with medical necessity is confirmed by the numerous examples of inexplicable and excessive services detailed below, and also by the fact that Radden routinely associated with clinics and providers that were unlawfully operated and controlled by laypersons.[1]

56.     Defendant CHHC has also been the subject of at least three (3) disciplinary investigations since 2015 that addressed numerous deficiencies, including the following: (1) failure to adequately coordinate, implement, and follow treatment plans; (2) failure to ensure plans of care for each patient were safe; (3) failure by a registered nurse to adequately monitor and report patients' health statuses; (4) failure to adequately instruct home health aides; (5) failure by a registered nurse to adequately supervise in-home patient visits; and (6) failure to

---

[1]  Many of the patients at issue herein were referred between the defendants and a clinic named Vital Community Care, P.C. ("Vital") whose layperson owner, Youssef Bakri, pleaded guilty on February 28, 2022 to federal felony charges related to a scheme involving kickback payments for unnecessary drug testing.  *See* United States v. Youssef Bakri, 21-cr-20484-NGE-EAS, Docket No. 23 (E.D. Mich.). Some of Spine Specialists's doctors, including Radden and Gary Gilyard, M.D. ("Gilyard"), also treated patients at Vital and utilized the surgical suites at MASC for unnecessary surgeries.  Radden also purportedly performed services for a layperson-owned entity called Mercyland Health Services, PLLC, which has been the subject of numerous insurer fraud and law enforcement investigations and litigation.

11

conduct assessments that accurately reflected patients' current health status, past medical history, and ascertain patients' immediate care needs.

57.    As a result of their relationship and shared control, the defendants and their associates had a significant financial motivation to bill Allstate for as many services, testing, and procedures as possible, all at excessive rates and regardless of medical need and applicable standards of care.

58.    The defendants' bills and associated records were sent to Allstate through the U.S. Mail, and Allstate relied on the mailings sent by the defendants in adjusting and paying insurance claims.

## V.    <u>BILLING FOR SERVICES NOT RENDERED</u>

59.    The defendants' pervasive conduct in mailing demands for payment to Allstate for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

60.    All of the bills submitted by the defendants to Allstate through the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

61.    Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

62.    As one example, Spine Specialists billed Allstate for a high complexity examination to patient L.C. (Claim No. 0720442870)[2] on October 17, 2023 that did not occur at all.

63.    The medical report submitted by Spine Specialists associated with this alleged visit confirmed that L.C. only came to the clinic (if at all) to speak with a physician's assistant to discuss determining a date for a shoulder surgery that had already been recommended.

64.    Despite signing the medical record to falsely support billing for an examination that did not occur, Spine Specialists admitted that L.C. was "here today for scheduling . . . [s]he came in to talked to my physician assistant" and that "[t]hey had a discussion[,]" confirming that the physician who claimed to perform the evaluation never even saw the patient on October 17, 2023.

65.    The report contains no examination findings at all, because no examination was actually performed.

66.    In addition to the specific instances of billing for services not rendered set out *infra*, which exemplify the types of fraudulent submissions made relative to the patients at issue in this Complaint, certain whole categories of charges for

---

[2] To protect the confidentiality of its insureds, Allstate refers to them herein by initials and Allstate claim number. The defendants are aware of the Allstate claim number, as the defendants included the claim number on the bills they submitted to Allstate.

services that were never performed were so pervasive that they are addressed separately below.

### A. BILLING FOR PHYSICAL THERAPY NOT PERFORMED

67. Spine Specialists and Radden routinely billed for physical therapy not actually provided to patients by adding huge charges for non-specific physical therapy modalities that were not documented.

68. The billing for services not rendered is so egregious in this instance that one cannot even ascertain what Spine Specialists's and Radden's charges represent.

69. For several patients, Spine Specialists and Radden included charges using Current Procedural Terminology ("CPT")[3] code 97039, which is used to report a constant attendance physical therapy modality that does not otherwise have a specific code.

70. For several patients, Spine Specialists and Radden billed using this code on nearly every date of purported service without ever describing what treatment was applied, identifying what body part was being treated or recording the amount of time "constant attendance" was provided.

71. For example, Spine Specialists billed Allstate $34,800 using CPT code 97039 relative to M.H. (Claim No. 0656091501) over six (6) dates from June 22,

---

[3] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

2022 to July 7, 2022 without explaining what, if any, therapy was applied to what body part or for how long.

72. Spine Specialists billed Allstate a total of $104,400 using CPT code 97039 relative to K.Y. (Claim No. 0674982269) on eighteen (18) dates from August 1, 2022 to April 21, 2023 without explaining what, if any, therapy was applied to what body part or for how long.

73. Each time Spine Specialists and Radden billed using CPT code 97039, Allstate was charged an outrageous sum of $5,800 for a single unspecified modality that included no description of what treatment was performed to which body part (since none was) or why it was necessary (because it was not).

74. Spine Specialists and Radden have billed Allstate at least $562,600 for this single modality that was never performed on patients.

**B.    BILLING FOR VIDEO ELECTROENCEPHALOGRAM MONITORING NOT PERFORMED**

75. Spine Specialists and Radden repeatedly billed Allstate for medically unnecessary 72-hour ambulatory electroencephalograms ("EEGs") that were not actually performed.

76. Aside from the fact that these tests are generally only appropriate for confirming the diagnosis of a seizure disorder such as epilepsy and have no utility when applied to alleged orthopedic injuries like those arising from minor motor

vehicle accidents, 72-hour ambulatory EEGs require a patient to wear equipment that allegedly monitors electrical brain waves for 72 consecutive hours.

77.    Moreover, CPT code 95951, the code routinely billed by Spine Specialists and Radden for these alleged tests, requires video recording and interpretation of patients' brain activity.

78.    Each time Spine Specialists billed Allstate for 72-hour ambulatory EEGs, it billed three (3) separate charges using CPT code 95951, one for each day the patient was purportedly monitored.

79.    Use of this CPT code represented that the patient's brain activity was recorded using visual video equipment for three (3) consecutive days, and that the video was reviewed and interpreted by a neurologist.

80.    Despite the requirement for constant recording and interpretation, Spine Specialists routinely produced only seconds of allegedly recorded brain waves without any accompanying video or interpretation, confirming Spine Specialists did not perform the testing as billed, or at all.

81.    For example, Spine Specialists and Radden billed Allstate for a 72-hour ambulatory EEG to J.M. (Claim No. 0453881245) that allegedly began on December 18, 2018 and ended on December 20, 2018.

82.    Spine Specialists and Radden produced a total of eleven (11) seconds of allegedly recorded brain activity to document the 72-hour ambulatory EEG.

16

83.     All of the charges submitted for the 72-hour ambulatory EEG by Spine Specialists and Radden described an EEG performed with video monitoring, but no video monitoring was actually performed by Spine Specialists.

84.     Thus, Spine Specialists and Radden billed a total of $28,500 for video EEG monitoring that was neither medically indicated nor actually rendered, in addition to being outrageously overcharged.

85.     In another example, Spine Specialists and Radden billed Allstate $28,500 for a 72-hour ambulatory EEG to A.H. (Claim No. 0541471900) that allegedly began on November 5, 2019 and ended on November 7, 2019 and again lacked any video monitoring.

86.     Spine Specialists billed each purported EEG test at a rate of $9,500 per day, for a total of $28,500 per alleged 72-hour ambulatory EEG.  *See* Exhibit 1.

87.     Every instance of Spine Specialists billing for a 72-hour video EEG is an instance of billing for a service that was never rendered.

88.     Allstate is not required to pay the defendants for medically unnecessary diagnostic testing that was not actually performed.

### C.   BILLING FOR INJECTIONS NOT PERFORMED

89.     Spine Specialists and MASC routinely billed for injections not actually provided to patients by adding charges for more disc levels than were actually treated, if any injections were performed at all.

90.     Spine Specialists and MASC routinely billed for facet injections to at least two (2) vertebral levels at a time.

91.     A facet joint is located in the space between the bones of the spinal column, such that a two (2) level facet joint injection involves three (3) vertebral levels.

92.     When the defendants reported that they performed a two-level facet injection (e.g., from spinal levels L4 to S1), they billed for three (3) separate levels of injections, the third of which was not actually performed (if any injections were performed at all).

93.     For example, on May 10, 2022, May 24, 2022, June 7, 2022, December 20, 2022, and January 17, 2023, Spine Specialists and MASC billed for three (3) facet injections to the L4, L5, and S1 spinal levels allegedly administered to K.S. (Claim No. 055244709) when at most only two (2) were performed (if any were at all) on each date.

94.     In another example, Spine Specialists and MASC billed for purported three-level facet injections to D.B. (Claim No. 0590318234) on April 20, 2021 and May 4, 2021.

95.     On both occasions, the defendants reported that injections were done at the L4 to S1 levels of D.B.'s lumbar spine, which constitutes two (2) facet joints between L4-5 and L5-S1.

18

96.     Spine Specialists and MASC billed for purported three-level facet injections to D.M. (Claim No. 0575799308) on April 6, 2021.

97.     The defendants reported that the injections were done to the L4 to S1 levels of D.M.'s lumbar spine, which constitutes just two (2) facet joints at L4-5 and L5-S1.

98.     In another example, J.L. (Claim No. 0659989452) testified on July 20, 2023 he did not receive any injections following his alleged motor vehicle accident.

99.     Spine Specialists billed for an injection to J.L. (Claim No. 0659989452) it did not perform on July 7, 2022.

### D.     BILLING FOR SURGICAL COMPONENTS NOT PERFORMED

100.    Spine Specialists's and MASC's bills for surgical procedures consistently included long lists of charges using several CPT codes and a multitude of code modifiers.

101.    In many cases, not only were these charges excessive and fraudulently double billed as detailed *infra*, they also included bills for components of procedures that were not performed at all.

102.    For example, on September 19, 2022, MASC billed Allstate for a right rotator cuff repair surgery allegedly performed by Gilyard on patient A.A. (Claim No. 0609452602).

103.   Among other charges, MASC billed $15,600 for a distal claviculectomy, which is an arthroscopic procedure that entails shaving down the end of the damaged clavicle using a motorized burr that was not done at all.

104.   In another example, on October 5, 2019, Spine Specialists and MASC each billed for an alleged shoulder surgery to F.B. (Claim No. 0562503978) and each defendant billed an additional $9,000 and $17,500, respectively, for an alleged capsulorraphy that was never performed.

105.   Allstate is not required to pay for components of alleged surgical procedures that were not actually performed and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing.

**E.   BILLING FOR INTRAOPERATIVE NEUROMONITORING NOT PERFORMED**

106.   Spine Specialists and Radden routinely added charges for intraoperative neuromonitoring ("IONM") procedures to bills submitted to Allstate for spinal surgeries.

107.   IONM is generally only used to ensure that patients with significant comorbidities do not suffer additional injury during a surgery, and is not appropriate nor medically necessary for all procedures and patients.

108.   Radden and Spine Specialists used IONM providers including Comprehensive Neuromonitoring, LLC ("Comprehensive Neuromonitoring") and

Comprehensive Care Services Inc. ("Comprehensive Care") for alleged IONM services.

109.   These companies billed for both the technical and professional components of the alleged IONM services.

110.   Despite these other providers billing for all components of alleged IONM procedures, Spine Specialists and Radden routinely also billed for alleged professional services for the same IONM services already billed for by Comprehensive Neuromonitoring.

111.   For example, Comprehensive Neuromonitoring billed Allstate for continuous monitoring allegedly conducted by Sidney Broder, M.D. ("Broder") during L.C.'s (Claim No. 0624907051) anterior cervical spinal fusion on January 17, 2022.

112.   Comprehensive Care submitted an identical bill for purported IONM services during L.C.'s surgery on January 17, 2022 allegedly performed by Jay E. Fanelli, CNIM ("Fanelli") and affixed a "TC" modifier to each charge, signifying that Fanelli performed the technical component of the IONM.

113.   Spine Specialists and Radden submitted a bill that included CPT code 95861 for needle electromyography in two (2) extremities to L.C. on January 17, 2022 despite Comprehensive Neuromonitoring billing that exact code with a 26 modifier (signaling the professional fee) and Comprehensive Care billing the same

code with a TC modifier (signaling the technical component) on the same date to the same patient.

114.   Moreover, operative reports often failed to describe the IONM services for which Spine Specialists billed, confirming they were not actually performed.

115.   Spine Specialists, MASC, and Radden billed Allstate for a fusion with lumbar laminectomy and discectomy on September 28, 2019 to T.P. (Claim No. 0327585485).

116.   Spine Specialists's bill included four (4) separate charges for purported IONM services, including neuromuscular junction testing, needle electromyography, and two (2) charges for short-latency somatosensory testing.

117.   The operative report for T.P. on September 28, 2019 did not describe neuromuscular junction testing or short-latency somatosensory testing at all.

118.   Further, to bill for needle electromyography, extremity muscles innervated by three (3) nerves or four spinal levels must be evaluated.

119.   MASC did not identify which extremity muscles or spinal levels were evaluated, confirming that this test was not performed by Spine Specialists as billed (if at all).

120.   Moreover, Comprehensive Neuromonitoring also billed for neuromuscular junction studies, needle electromyography, and two (2) charges for short-latency somatosensory testing to T.P. on September 28, 2019.

121.  The technical component of the procedure was performed by Fanelli and the professional interpretation was performed by Broder, not by Radden.

122.  In yet another example, Spine Specialists billed Allstate $6,000 for neuromuscular junction studies during patient L.S.'s (Claim No. 0587222950) alleged lumbar fusion surgery on April 23, 2021, but no such studies were actually performed.

123.  Moreover, even if Radden actually performed or supervised IONM, which he did not, accepted practice and billing guidelines provide that a surgeon performing an operative procedure may not bill separately for intraoperative neuromonitoring since those services are already covered by Radden's surgical/operative work.

124.  Allstate is not required to pay for IONM charges for services that were not actually performed and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing.

**F.   EPIDUROGRAPHIES NOT PERFORMED**

125.  When Spine Specialists, MASC, and Radden billed for injections, they also routinely billed for epidurographies that were not performed.

126.  The defendants billed for these purported services to increase their charges and to help conceal the fact that they were dramatically overcharging for minor procedures.

127. An epidurography is a specific diagnostic test that involves fluoroscopic observation and separate radiologic documentation of the flow of contrast dye.

128. Epidurographies are typically only appropriate when other diagnostic imaging such as an MRI or CT scan cannot be obtained or is somehow insufficient.

129. While the defendants may have used fluoroscopic guidance including the use of contrast dye for needle placement for injections (which is a component of the injection itself and not separately payable as detailed *infra*), that does not constitute an epidurography.

130. For example, Spine Specialists, MASC, and Radden billed Allstate for epidurographies on December 15, 2020 and December 29, 2020 to D.C. (Claim No. 562072066) in relation to alleged epidural steroid injections.

131. Spine Specialists, MASC, and Radden failed to record images or produce formal radiological reports for these claimed tests, confirming that no epidurographies were actually done on these dates.

132. Moreover, many of the patients for whom the defendants billed for alleged epidurographies already had MRIs or CT scans so any epidurographies would have been unnecessarily duplicative even if they had been performed (which they were not).

133.   Spine Specialists, MASC, and Radden fraudulently added charges for the alleged performance of epidurographies to nearly every bill for fluoroscopically-guided injections.

### G.   BILLING FOR DRUG TESTING NOT PERFORMED

134.   NA Labs routinely billed for urine drug testing using Healthcare Common Procedure Coding System ("HCPCS") code G0481, which describes testing of eight (8) to fourteen (14) different drug classes.

135.   When NA Labs billed using G0481, it also billed a separate and additional code for each individual drug it allegedly tested, which is fraudulent double billing.

136.   For example, NA Labs billed for purported UDT of a specimen collected from K.S. (Claim No. 0552442709) using HCPCS Code G0481 on seven (7) dates from December 20, 2021 to June 5, 2023.

137.   On each of these seven (7) dates, NA Labs not only billed for testing eight (8) to fourteen (14) different drug classes, it also billed additionally for each individual drug included within those classifications for up to as many as twenty-three (23) different individual drugs.

138.   Despite billing to test for each individual drug twice, NA Labs at most performed testing for each once (if any testing was performed at all).

139.   NA Labs also routinely billed for urine drug testing using HCPCS code G0483, which describes testing at least twenty-two (22) different drug classes.

140.   When NA Labs billed using G0483, it did not actually perform tests of at least twenty-two (22) different drug classes, as many of the substances for which it claimed to test, such as various types of opioids and anti-depressants, fell into the same drug class.

141.   Allstate is not required to pay for UDT that was not actually performed and is entitled to recover any payments tendered to NA Lab as a result of its fraudulent billing.

### H.   BILLING FOR HOME CARE SERVICES NOT PERFORMED

142.   As discussed below, CHHC operated pursuant to a predetermined protocol whereby it billed for the same alleged wound care, nursing, and physical therapy services to patients who allegedly underwent surgical procedures (including minor arthroscopies and manipulations under anesthesia).

143.   CHHC adhered to this standardized billing protocol even when the services were not actually performed.

144.   CHHC routinely billed more than $3,000 for alleged physical therapy services simply for generating a record of discharge on dates no therapy was performed.

145.   For example, on September 27, 2022, CHHC reported that A.A. (Claim No. 0609452602) had begun physical therapy at a normal outpatient facility and therefore was discharged from the (unnecessary) course prescribed by Spine Specialists after an alleged shoulder arthroscopy on September 19, 2022.

146.   The report from September 27, 2022 expressly states that the patient verbalized understanding of the discharge and that the discharge had been confirmed with the prescribing physician at Spine Specialists.

147.   Nevertheless, CHHC billed more than $3,300 per day for alleged physical therapy to A.A. post-discharge on September 29 and October 1, the latter of which apparently only because a boilerplate discharge summary was printed on that date.

148.   Even when CHHC generated records purporting to document services to A.A., those services were largely merely education about post-surgical care and certainly did not constitute more than $3,300 of physical therapy services per date.

149.   Similarly, on July 13, 2022, CHHC reported that M.H. (Claim No. 0656091501) had started physical therapy at an outside facility and requested that home care stop.

150.   Despite clearly discontinuing care, CHHC billed more than $3,300 for alleged physical therapy services on July 14, 2022, apparently for generating a boilerplate discharge summary for its own records.

151.   Allstate is not required to pay CHHC for physical therapy or nursing services that were not actually rendered and is entitled to repayment and full damages caused by CHHC's claims for services that were not performed.

## VI.   TREATMENT RESULTED FROM FACTORS OTHER THAN LEGITIMATE MEDICAL JUDGMENT

152.   The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan.

153.   A physician who served as a consultant for a medical-legal consulting company named Eugene O. Mitchell, M.D. ("Mitchell") filed an allegation against Radden with the Michigan Bureau of Health Care Services pertaining to Radden's improper and excessive use of injections.

154.   When interviewed in connection with his complaint, Mitchell stated that motor vehicle accident victims were referred to Radden by their attorneys because Radden always includes injections in his plan of care.

155.   This understanding is particularly remarkable with respect to Radden because Radden is not even trained as a pain management physician; he is an orthopedic surgeon.

156.   Personal injury attorneys with whom Radden maintained referral relationships knew that the defendants would routinely bill for excessive and exorbitantly expensive treatment, thereby inflating the perceived value of their clients' insurance claims.

28

157.  As discussed *supra*, Radden has also been the subject of disciplinary action by the Board for improper use of injections.

158.  Patients who require solicitation, inducement, or pressure to seek medical treatment do not actually require medical care.

159.  Allstate is not required to pay the defendants for purported medical services that were not reasonable and necessary for the care of the patients at issue herein and that derived from illegal solicitation and *quid pro quo* arrangements, and it is entitled to a return of the monies it has been induced to pay as a result of the defendants' false submissions derived therefrom.

## VII.  <u>MULTIPLE BILLING FOR IDENTICAL SERVICES</u>

160.  Spine Specialists, MASC, and Radden each regularly billed Allstate multiple times for the same purported services.

161.  When a procedure is performed on an outpatient basis, any facility fee associated with such procedure must be billed using the CPT code(s) that describes the procedure and all drugs, supplies, and ancillary services provided by the facility are included in the charge.

162.  For the vast majority of the procedures at issue, Spine Specialists and MASC billed both CPT codes that are inclusive of all purported services and separate line items for supplies, drugs, and other materials allegedly used during such procedures.

163.   MASC billed Allstate thousands of dollars for supplies such as surgical implants and tools allegedly used during procedures, all of which was also covered by the charges for the procedures themselves, particularly since MASC could only bill for its provision of space and supplies since it did not provide any professional services.

164.   Spine Specialists also billed Allstate thousands of dollars for the same surgical supplies and tools, all of which was also covered by the charges for the procedures themselves and not separately billable.

165.   In addition to improperly double billing Allstate for supplies, drugs, and ancillary services that were already included in the charge for procedures themselves, Spine Specialists, MASC, and Radden regularly billed Allstate for components of procedures that are not separately billable.

166.   In these instances, Spine Specialists and MASC billed Allstate at least three (3) separate times for the exact same purported services.

167.   Among the charges that were routinely fraudulently billed by Spine Specialists and MASC in this manner were purported use of fluoroscopy during procedures, debridement and other components of surgical procedures that are necessary and included in the charge for primary procedures, and instrumentation that is included in the cost of the alleged procedures.

168.   The bills for professional services submitted by Spine Specialists and Radden for the procedures done at MASC used many of the same fraudulent billing practices to double bill Allstate for purported services.

169.   Among the most commonly billed procedures by defendants Spine Specialists and MASC were outpatient spinal fusion surgeries that they collectively billed for hundreds of thousands of dollars each.

170.   The defendants generated the enormous total for these outpatient procedures by double and triple billing Allstate for the majority of the components thereof.

171.   For example, Spine Specialists and MASC billed Allstate for an alleged outpatient spinal surgery to patient L.S. (Claim No. 0587222950) on September 25, 2020 for which more than one half of the charges were double billed.

172.   MASC billed Allstate separately for each of the following purported components of the procedure: (1) arthrodesis, (2) instrumentation, (3) insertion of device, and (4) fluoroscopy.

173.   Two (2) of the above four (4) categories of charges (instrumentation and fluoroscopy) were included components of the charges for arthrodesis and insertion of a biomechanical device.

174.   Similarly, Spine Specialists also billed Allstate separately for the following purported components of the procedure: (1) arthrodesis, (2) instrumentation, (3) insertion of device, (4) allograft, and (5) fluoroscopy.

175.   Three (3) of the above five (5) categories of charges (instrumentation, allograft, and fluoroscopy) were included components of the charges for arthrodesis and insertion of a biomechanical device.

176.   In another example, Spine Specialists and MASC billed Allstate for an alleged arthroscopic rotator cuff repair and biceps tendon release to patient T.N. (Claim No. 0648658524) on January 26, 2022.

177.   Spine Specialists and MASC billed separate charges for the rotator cuff repair and also for debridement of the rotator cuff, which is a necessary component of performing a rotator cuff repair.

178.   Because debridement is a necessary component of performing the primary procedure (in this example, a rotator cuff repair), coding guidelines expressly provide that it is not a separately billable service.

179.   Similar double billing was repeated by the defendants with respect to nearly every purported orthopedic surgery and pain management injection at issue herein.

180.   In addition to double billing fluoroscopy charges for routine pain management injections that should never have been done in a surgical setting in the

first place, defendant Spine Specialists further fraudulently inflated its charges by billing Allstate separately when an injection was allegedly done bilaterally.

181.   When a procedure is done bilaterally, CPT code modifier 50 may be reported by a provider as a signal to the payor that results in an increase in the payment rate.

182.   Rather than adhere to billing guidelines for the CPT codes it used to submit charges to Allstate, Spine Specialists submitted separate and additional charges when pain management injections were allegedly done bilaterally.

183.   As just one of many examples, on February 11, 2020, Spine Specialists, MASC, and Radden billed for a bilateral sacroiliac joint injection to patient C.A. (Claim No. 0356131714).

184.   Spine Specialists billed separately for each side of the alleged injection using the CPT code modifiers "RT," signaling a right-sided procedure, and "LT," signaling a left-sided procedure.

185.   Spine Specialists and MASC also both billed huge amounts for alleged robotically assisted procedures using HCPCS code S2900.

186.   HCPCS code S2900 is not a payable code at all, but rather was created in order to report to certain commercial payors that a procedure was robotically assisted.

187.  A surgeon may elect the specific method to perform a primary procedure, but electing to use robotically assisted methods does not then allow the surgeon (or ambulatory surgery center) to bill additional amounts.

188.  Together, Spine Specialists and MASC added charges totaling at least $263,000 for alleged robotic assistance in addition to billing for the primary procedures for which it was supposedly used.

189.  Allstate is not required to pay the defendants for charges for the same purported services that are double or triple billed, and it is entitled to a return of the monies it has been induced to pay as a result of the defendants' fraudulent submissions.

## VIII.  UNREASONABLE, UNNECESSARY, AND EXCESSIVE TREATMENT

190.  The defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

191.  Together, the defendants utilized a predetermined protocol of treatment through which patients were prescribed the same tests, treatment, unnecessary and indiscriminate UDT, and home healthcare services that were designed to maximize the amount of the bills submitted to Allstate.

192. This predetermined protocol did not take into consideration the individual patient's medical needs, injuries, or comorbidities, but instead was designed to generate charges regardless of clinical justification.

193. As part of the predetermined treatment protocol, the defendants subjected their patients to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services, risking patient safety in order to inflate their bills to Allstate.

194. The defendants also grossly overutilized surgical procedures and anesthesia in disregard for standards of care.

195. The defendants also unnecessarily used surgical suites for procedures (to the extent the procedures were performed at all) that do not need to be performed in a surgical setting simply so that MASC and Radden could bill Allstate facility fees in addition to the procedure/physician fees.

196. Defendant CHHC billed for alleged home healthcare treatment that was clearly unnecessary and excessive.

197. The defendants' purported treatment violated standards of care in the medical community, as the testing, diagnostics, referrals, and treatment were not indicated, redundant, excessive, and repeated without any objective documented benefit to patients.

198.   The full extent of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

199.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 5.

200.   All of the bills submitted by the defendants to Allstate through the U.S. Mail seeking payment for unnecessary, unlawful, and unreasonable treatment are fraudulent.

201.   Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

202.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

### A.   FALSE DIAGNOSES AND REPORTS OF PHYSICAL LIMITATIONS

203.   In order to create the appearance of necessity for the extensive unnecessary services detailed below, and to induce Allstate to pay for the same, the defendants first created medical records that falsified patients' complaints and

examination findings and made diagnoses that were not and could not have been supported.

204.   Spine Specialists and Radden used the same descriptions of patients' alleged pain and purported examination findings, including findings allegedly made by orthopedic, range of motion, and neurologic testing.

205.   Additionally, Spine Specialists and Radden routinely billed Allstate for purportedly providing telehealth services that included alleged findings that were impossible to detect in a telehealth visit.

206.   For example, Spine Specialists submitted bills for evaluations of D.W. (Claim No. 0551520828) on June 1, 2020 and July 13, 2020, both purportedly conducted remotely via telehealth.

207.   Despite these examinations being conducted as telehealth visits, Spine Specialists reported detailed physical examination findings including palpation, neurological testing, reflex testing, and range of motion of the cervical and lumbar spine, which could not possibly be conducted over telecommunications as they require physical contact with the patient.

208.   For the cervical spine, Spine Specialists reported that D.W.'s "deep tendon reflexes are +2/4 for biceps, triceps, brachioradialis with negative Hoffman's sign and negative clonus."

209.   For the lumbar spine, Spine Specialists reported that D.W.'s "reflexes are +2/4 for quadriceps and Achilles, no clonus.  Vascular exam is +2/4 for dorsalis pedis and posterior tibialis."

210.   Spine Specialists also noted "[p]araspinal muscle spasm . . . upon palpation of the lumbar spine.  Midline tenderness is noted.  Paraspinal muscle tenderness is noted bilaterally[,]" which was impossible to determine without physically touching the patient.

211.   Similarly, Spine Specialists and Radden billed Allstate for a level four (4) evaluation of E.M. (Claim No. 0548398493) on June 17, 2020 purportedly conducted remotely via telehealth that included reflex findings and palpation exam findings, examinations that could not possibly be performed over the telephone.

212.   As the specific testing allegedly included in these billed for examinations could not possibly be conducted without physically touching the patient, the purported results of these tests (which were used to create the appearance of support for the excessive predetermined treatment protocol described below) could only be fabrications.

213.   As detailed above, it is clear that many of the test results reported by Spine Specialists and Radden were fabricated, as the defendants reported false results of palpation, range of motion, and neurologic examinations through telehealth encounters, which were not possible to determine via a virtual exam.

214.   Spine Specialists and Radden also routinely falsely reported taking patient vital signs, including temperature and oxygen saturation readings, during telehealth visits, none of which could have actually occurred.

215.   Spine Specialists also regularly diagnosed patients with severe injuries that would have required diagnostic imaging that had not been performed.

216.   For example, on November 18, 2020, Spine Specialists and Radden diagnosed patient D.W. (Claim No. 0606721966) with cervical disc displacement, intervertebral lumbar disc displacement, lumbar facet syndrome, and cervical facet syndrome before D.W. had any MRIs, which would have been necessary to diagnose "disc displacement," or any diagnostic testing to assess pain originating from cervical or lumbar facet joints.

217.   Spine Specialists and Radden ordered a cervical MRI, allegedly performed on November 23, 2020, that was entirely unremarkable for any acute injuries.

218.   Nevertheless, every Spine Specialists record pertaining to D.W. that followed continued to include "cervical disc displacement" and "cervical facet syndrome" as diagnoses, which were used to falsely justify Spine Specialists, MASC, and Anesthesia Services billing for three (3) level cervical facet injections on August 17, 2021 and August 31, 2021.

219.   In another example, Spine Specialists diagnosed M.H. (Claim No. 0656091501) with a complete rotator cuff tear and a superior glenoid labrum lesion, both of which would require MRI imaging to confirm, despite no MRI imaging being performed at the time the diagnoses were made on April 12, 2022.

220.   Spine Specialists and Radden made these types of diagnoses to create the appearance of propriety for the extensive course of injections and surgeries they recommended and billed for nearly every patient, even when MRI evidence directly contradicted the same.

221.   For example, patient T.R. (Claim No. 0521488916) had an MRI of her cervical spine on December 14, 2018, which found no malalignment or herniations of any kind.

222.   As false support for the ensuing two (2) cervical epidural injections and two (2) cervical facet injections billed by Spine Specialists, Radden, and MASC (for which Anesthesia Services also billed for unnecessary sedation) on April 26, 2019, May 31, 2019, September 14, 2019, and September 28, 2019, Radden included "cervical herniated disc" as the pre- and post-operative diagnoses.

223.   CHHC also included nonsensical "findings" to falsely support billing for unnecessary home healthcare treatment.

224.   Patients recovering from routine arthroscopic joint surgeries are typically not homebound following outpatient procedures in the absence of unique

circumstances and comorbidities that did not exist with respect to the patients at issue herein.

225.   Nevertheless, CHHC routinely included statements in its medical reports to deceive insurers like Allstate into believing patients required in-home rather than outpatient therapy (to the extent any therapy was needed at all).

226.   For example, A.A. (Claim No. 0609452602) was referred to CHHC for home healthcare services following an outpatient arthroscopic shoulder surgery on September 19, 2022.

227.   Despite A.A. having no injury or impairment to his lower extremities that would impact his mobility, CHHC falsely stated that A.A. had "unsteady gait needing assistance."

228.   The purported justifications for the treatment at issue herein were fabricated, exaggerated, and otherwise invalid and the services billed pursuant to the defendants' misrepresentations and predetermined protocol were unnecessary and non-compensable under Michigan's No-Fault Act.

B.   **EXCESSIVE AND MEDICALLY UNNECESSARY INJECTION PROCEDURES**

229.   Once referred to Spine Specialists, patients were subjected to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services that were unnecessarily repeated, risking patient safety in order for the defendants to inflate their bills to Allstate.

230.   The performance of pain management and diagnostic injections must be based upon adequate medical indications and legitimate medical necessity.

231.   Rather than legitimate medical necessity, the defendants pressured patients to undergo multiple injections to generate as many charges for professional services, anesthesia services, and facility fees as possible.

232.   The defendants billed for unjustified and needlessly repetitious invasive procedures while ignoring little to no symptom improvement reported by patients and subjecting the patients to unnecessary health risks, including possible infection and the risks associated with anesthesia.

233.   The defendants pushed these injections even when patients had not yet attempted conservative treatment, and where there had not been sufficient time since the patient's accident to permit the normal and expected minor pain and soreness from the accident to resolve on their own, which is contrary to the accepted standard of care.

234.   Spine Specialists and Radden also routinely ignored the (lack of) efficacy of injections and instead billed for multiple injections in predetermined series regardless of whether the previous injections were effective.

235.   Even in instances where patients reported improvement from conservative treatment, Spine Specialists and Radden still pushed for injections to be administered, which again is not the standard of care.

236.   For example, D.C. (Claim No. 0461245755) reported on January 8, 2018 that his outpatient physical therapy was helping to relieve his pain symptoms and Radden noted on that date "[t]here has been significant improvement in the symptoms since the last visit."

237.   Despite D.C.'s improving symptoms from physical therapy, Radden scheduled D.C. for two (2) sets of cervical steroid injections followed by two (2) sets of cervical facet injections, a treatment plan that makes no logical sense as D.C. exhibited no neurological deficits, epidural steroid and facet injections are intended to treat and diagnose entirely different conditions, and scheduling this many injections in a series would not allow Radden to evaluate the efficacy of each injection before administering another one.

238.   Epidural steroid injections should only be performed on patients who have properly diagnosed disc injuries and radiculopathies based on appropriate examination and testing.

239.   D.C. did not have signs of radiculopathy and exhibited no sensory, reflex loss, or motor loss during his cervical examination on January 8, 2018.

240.   Nevertheless, Spine Specialists, MASC, Anesthesia Services, and Radden billed Allstate for a cervical steroid injection to D.C. on January 16, 2018.

241.   During D.C.'s follow up examination on February 5, 2018, D.C. reported an adverse effect of the steroid injection as he experienced a burning

sensation in both arms accompanied by numbness and tingling for a few days followed by only short-term pain relief, with pain returning to a level eight (8) out of ten (10).

242.   Despite the adverse side effects and lack of lasting pain relief, Spine Specialists and Radden inappropriately billed for a repeat cervical steroid injection to D.C. on February 14, 2018.

243.   Thereafter, Spine Specialists and Radden performed no intervening examination to evaluate the efficacy of the February 14, 2018 injection and instead simply proceeded to bill the pre-scheduled C4-5 and C5-6 facet injections on February 28, 2018.

244.   Despite D.C. reporting no improvement from the cervical facet injections of February 28, 2018, Spine Specialists, MASC, Anesthesia Services, and Radden billed Allstate for three (3) more cervical facet injections to D.C. on March 13, 2018.

245.   After the above predetermined series of injections, D.C. confirmed during a follow up visit on April 3, 2018 that the injections did not help.

246.   Further, more than two (2) weeks had elapsed since D.C.'s last injection and he again reported a lasting burning and tingling sensation down both of his arms, which was consistent with his previously reported side effect and strongly suggests the series of injections by the defendants actually worsened D.C.'s symptoms.

247.   Spine Specialists and Radden routinely scheduled patients for multiple injections at once, an improper practice that makes it impossible to evaluate the efficacy of the first (and subsequent) injection.

248.   For example, during T.R.'s (Claim No. 0521488916) evaluation at Spine Specialists on January 7, 2019, Radden ordered several different types of injections as part of the initial treatment plan.

249.   Thereafter, Spine Specialists, MASC, and Radden billed for two (2) sets of multilevel lumbar facet injections only two (2) weeks apart on March 5, 2019 and March 19, 2019 and two (2) sets of cervical facet injections also two (2) weeks apart on September 14, 2019 and September 28, 2019.

250.   There is no medical reason to repeat facet injections, which are a diagnostic procedure to evaluate whether to proceed to other types of treatment such as radiofrequency ablations, since the diagnostic information of whether a patient experienced pain relief is gleaned from the first procedure.

251.   The defendants virtually never proceeded to such treatments and instead simply repeated injections despite no improvement in patients' conditions, and even when patients' conditions and treatments rendered these billed procedures meaningless.

252.   For example, on May 10, 2022, Spine Specialists, MASC, Anesthesia Services, and Radden billed for three (3) right-sided lumbar facet injections from L4

45

through S1 (which is only two (2) levels despite the defendants fraudulently billing for three (3) levels) allegedly administered to K.S. (Claim No. 055244709).

253.   K.S. had previously undergone a lumbar fusion surgery such that a facet injection to the joint space at L5-S1 was clinically useless as K.S.'s immobilized facet joint at that level could not have been a pain generator.

254.   On May 24, 2022, Spine Specialists, MASC, and Radden billed for the same clinically meaningless injections (including again billing for more levels than were actually performed) to K.S.'s left side.

255.   Spine Specialists, MASC, and Radden repeated improperly billing for these same facet injections to K.S.'s lumbar spine on June 7, 2022, December 20, 2022, January 17, 2023, and February 7, 2023 despite that K.S. expressly reported at least twice during that time period that she was "feeling worse since the last visit" and only had, at best, moderate pain relief for short periods of time (which is not surprising, since facet injections are a diagnostic procedure not meant to be repeated or used for long-term relief).

256.   There could not have been a medically appropriate reason for these injections to be repeated several times, particularly over such short periods, to such a large number of patients and the bills submitted for doing so were designed only to maximize the charges to Allstate.

257. Further, these excessive, medically unnecessary, and wholly ineffective combinations of steroid injections and facet injections are particularly egregious as this conduct is precisely the same substandard medical practice for which Radden has already been disciplined, as discussed *supra*.

258. MASC also routinely billed for improperly administering amniotic injections to patients.

259. Amniotic injections are used as an experimental treatment of non-healing wounds and have no established utility for the care of musculoskeletal injuries.

260. Each time MASC billed for these outrageous injections, they were allegedly administered to patients' facet joints.

261. The administration of facet injections does not require an incision and does not cause any wound that would necessitate injectable wound care.

262. Nevertheless, MASC billed for useless amniotic injections to several patients during these procedures.

263. For example, MASC billed amniotic injections to B.C. (Claim No. 0648840033) on January 7, 2023 and January 24, 2023 during alleged facet injection procedures.

264. B.C. had no comorbidities or other condition that would lead any medical provider to believe she was susceptible to developing a non-healing wound

47

following a facet injection and the operative report stated only "2 cc of fluid flow" for each purported injection without indicating any medical reason for the injection (because there was none).

265.   MASC added $15,000 to each of B.C.'s bills for alleged facet injection procedures for these meaningless amniotic injections.

266.   In total, MASC billed Allstate at least an extra $367,500 for unnecessary amniotic injections that served no medical purpose and were designed only to increase the bills submitted to Allstate.

267.   MASC also billed Allstate the same $15,000 charge for allegedly injecting platelet rich plasma ("PRP") into patients' facet joints, which is another improper and experimental procedure that has no support in medical literature.

268.   Allstate is not required to pay the defendants for medically unnecessary injections that were indiscriminately billed without consideration of their effect on patients' conditions and is entitled to a return of the money it paid to the defendants as a result of the defendants' fraudulent submissions.

## C.   MEDICALLY UNNECESSARY USE OF SURGICAL SUITES FOR INJECTIONS AND ADMINISTRATION OF ANESTHESIA

269.   Radden owns Spine Specialists, MASC, and Anesthesia Services and received a financial windfall every time routine injections were unnecessarily performed in MASC's surgical suites under anesthesia billed by Anesthesia Services.

270.   The lack of medical necessity to perform injections in a surgical setting is confirmed by the fact that Radden himself administered injections to patients at Spine Specialists's office rather than in a surgical suite.

271.   For example, Spine Specialists and Radden billed for a C7-T1 epidural steroid injection allegedly performed to D.C. (Claim No. 0461245755) at MASC on January 16, 2018 (which billed facility fees for the alleged procedure) and for which Anesthesia Services billed for sedation.

272.   One month later, on February 14, 2018, Spine Specialists and Radden billed Allstate for a repeated C7-T1 epidural injection to D.C.; however, this time the injection was allegedly performed at Spine Specialists's office without the use of anesthesia or an ambulatory surgical center like MASC.

273.   The injection that was done in Radden's office without anesthesia was exactly the same as the injection to the exact same patient for which the defendants claimed use of a surgical suite and anesthesia was necessary.

274.   Similarly, as detailed *supra*, Spine Specialists and Radden also billed Allstate for multilevel cervical facet injections to D.C. on February 28, 2018 that were allegedly performed at the Spine Specialists office.

275.   Yet, when the defendants billed for (unnecessarily) repeating those cervical facet injections on March 13, 2018 to the same patient, they were allegedly

performed at MASC (which billed facility fee charges) with sedation billed by Anesthesia Services.

276.   There was no reason for any of these injections to be performed in surgical suites as the defendants did not report any unique conditions that would require patients to have injections done in surgical settings and under anesthesia, and none existed.

277.   According to the American Society of Anesthesiologists ("ASA"), "the majority of minor pain procedures do not require anesthesia care other than local anesthesia.  Such procedures include epidural steroid injections, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections."

278.   The ASA further states that "[t]he use of general anesthesia for routine pain procedures is warranted only in unusual circumstances," which rarely present themselves.

279.   Indeed, the ASA has expressly warned that unnecessary use of anesthesia for routine injections is a risky practice that is a major factor in the occurrence of inadvertent neural injury.  Rendering patients unconscious during an epidural steroid injection is especially risky because the patient cannot communicate nerve pain to the injecting physician if the needle is placed in a location that might cause neural injury.

280.   The defendants were undoubtedly aware of this increased risk, as they have been accused of causing the death of a patient following unnecessary anesthesia administered during a lumbar epidural procedure on July 18, 2018.  *See* Estate of Dominqua Colvin v. Spine Specialists of Michigan, P.C., et al., 2020-182381-NH (Wayne Co. Cir. Ct.).

281.   As with the unnecessary use of surgery centers for routine injections, the use of sedation during injection procedures was only to increase the amount of charges submitted to Allstate.

282.   When the defendants improperly billed for alleged anesthesia, they also made false representations about patients to further increase their charges.

283.   Bills for alleged anesthesia services include a "P" modifier, which is a physical status modifier that describes the condition of the patient receiving anesthesia.

284.   Physical status modifiers identify levels of complexity of the anesthesia services by describing the condition of the patient.  The modifiers are defined as follows:

- P1: A normal healthy patient
- P2: A patient with mild systemic disease
- P3: A patient with severe systemic disease
- P4: A patient with severe systemic disease that is a constant threat to life
- P5: A moribund patient who is not expected to survive without the operation

- P6: A declared brain-dead patient whose organs are being removed for donor

285.   Physical status modifiers P1 and P2 denote a normal healthy patient or a patient with minimal risk factors and do not affect the charge or payment amount for the anesthesia services.

286.   P3 and higher physical status modifiers allow for an anesthesia provider to submit a higher charge because of the patient's "severe systemic disease" and, for this reason, the defendants frequently and falsely claimed their patients' statuses were P3 without basis.

287.   For example, defendant Anesthesia Services falsely reported that T.D. (Claim No. 0680746807) had a condition supporting a P3 modifier on its bill for allegedly providing sedation during an arthroscopic shoulder surgery on November 5, 2022.

288.   Despite this designation of "severe systemic disease," Spine Specialists's examination found that T.D. had "[n]o known medical conditions."

### D.   MEDICALLY UNNECESSARY SURGICAL PROCEDURES

289.   In order to submit the highest possible charges as quickly as possible, physicians utilizing MASC routinely made surgical recommendations in the absence of examination and objective medical findings supporting the same.

290.   In many cases, Spine Specialists ignored or exaggerated findings of diagnostic imaging to falsely support the purported medical necessity of these procedures.

291.   For example, Spine Specialists physician Gilyard allegedly evaluated D.R. (Claim No. 0662608736) at Vital.

292.   Vital ordered an MRI of D.R.'s right knee that purportedly showed a partial patellar tendon tear and no evidence of a meniscal tear.

293.   Gilyard nevertheless recommended arthroscopic right knee surgery with lateral meniscal repair despite the fact that the MRI did not show evidence of a torn meniscus.

294.   Moreover, in the operative report for the ensuing right knee surgery that Gilyard allegedly performed at MASC on September 28, 2022, Gilyard noted as a preoperative diagnosis "right knee medial/lateral meniscal tear" to falsely justify performing the surgery.

295.   MASC billed Allstate $43,337 in facility fees for this surgery while Anesthesia Services billed another $13,000 for the anesthesia.

296.   In another example, MASC patient K.P. (Claim No. 0584369078) allegedly underwent a left shoulder MRI on June 15, 2020 that revealed "[n]o full-thickness rotator cuff tear."

297.   Gilyard falsely reported on November 10, 2020 that K.P had a "[c]omplete rotator cuff tear or rupture of the left shoulder" and used this fabricated diagnosis to falsely justify the ensuing left shoulder surgery for which MASC billed Allstate $88,100 while Anesthesia Services billed another $10,000 for sedation.

### E.   MEDICALLY UNNECESSARY AMBULATORY EEGS

298.   Spine Specialists routinely billed Allstate for meaningless 72-hour ambulatory EEGs that were not appropriate for alleged injuries stemming from minor motor vehicle accidents and were not used in any way to influence patients' treatment plans.

299.   As discussed *supra*, ambulatory EEGs are only appropriate to detect seizure disorders, which no patients at issue herein were suspected of experiencing.

300.   Patients for whom ambulatory EEGs were ordered were often not reported to have even experienced headaches or suspicion of concussion except for a conclusory statement or diagnosis added to the record by the defendants on the date that the ambulatory EEG was ordered to belatedly try to justify the EEG.

301.   For example, patient A.H. (Claim No. 0541471900) was allegedly involved in a motor vehicle accident on April 11, 2019.

302.   A.H. did not strike her head or lose consciousness and never reported any type of seizure activity.

303.   Spine Specialists and Radden billed Allstate $28,500 for an EEG allegedly beginning on November 5, 2019 and ending on November 7, 2019 purportedly for chronic headaches and cognitive difficulties despite no head injury.

304.   As one would expect, A.H.'s EEG showed entirely normal findings.

305.   There was no evidence to substantiate ordering an ambulatory EEG for A.H.

306.   Spine Specialists and Radden also billed Allstate $28,500 for an EEG allegedly performed December 12, 2019 through December 14, 2019 on patient B.S. (Claim No. 0558946901).

307.   Similarly, there was no evidence that B.S. ever exhibited signs of or was at risk for any type of seizure activity.

308.   No subsequent treatment note associated with any of the patients subjected to this testing ever mentions the EEG again and there is no evidence anyone ever followed up on the examination findings, thus confirming the EEGs were never even intended to direct any further treatment plan.

309.   The complete disregard for the EEG findings by the defendants further confirms that the 72-hour ambulatory EEG was only ordered for the purpose of generating as much billing as possible to Allstate and not for clinical utility or necessity.

310.   The defendants' use of ambulatory EEGs was not only medically unnecessary for the types of symptoms reported by patients, they were performed in disregard for the appropriate course of care, which calls for a traditional, in-office EEG to be performed before subjecting a patient to a three-day-long procedure, which was never done for any patient at issue.

### F.   MEDICALLY UNNECESSARY USE OF IONM

311.   Spine Specialists and Radden routinely billed for medically unnecessary IONM during purported spinal surgeries.

312.   To the extent that IONM is a medically accepted procedure during spinal surgeries, it is only used to ensure that patients – particularly those with significant comorbidities or complications – do not suffer additional injury during a procedure.

313.   Spine Specialists and Radden made no attempts to explain or even create the appearance of medical necessity of using IONM.

314.   Rather, Spine Specialists and Radden simply used IONM as part of virtually every spinal surgery allegedly performed on patients at issue in this Complaint as a predetermined matter of course to inflate bills submitted to Allstate.

315.   Spine Specialists and Radden regularly billed for IONM during spinal surgeries regardless of whether the patient had any comorbidities or particular risk of surgical complications.

316.   The IONM billed by Spine Specialists and Radden was never appropriate or medically necessary even for its accepted purpose of monitoring patient safety for the patients at issue herein.

317.   The American Academy of Neurology has issued guidance stating that "[i]ntraoperative monitoring is not medically necessary in situations where historical data and current practices reveal no potential for damage to neural integrity during surgery.  Monitoring under these circumstances will exceed the patient's medical need."

318.   The defendants never identified any medical reason that the patients at issue herein required IONM to monitor safety for the routine and protocol outpatient surgeries they allegedly performed and the IONM bills submitted by Spine Specialists and Radden could not have been for a reasonably necessary service.

### G.   MEDICALLY UNNECESSARY HOME HEALTHCARE TREATMENT

319.   The vast majority of the patients for whom CHHC billed Allstate were also patients of Radden and MASC.  *See* Exhibits 1 and 4.

320.   Many of the surgeries billed by MASC were minimally invasive arthroscopic procedures to joints resulting from minor motor vehicle accidents.

321.   These types of procedures do not involve incisions and do not require in-home wound care, nursing services, in-home physical therapy, and/or speech therapy services.

322.   In some cases, CHHC billed for alleged home services, including supplies for wound care, for patients who did not have procedures that involved incisions at all.

323.   For example, on March 29, 2021, MASC billed for an alleged manipulation under anesthesia of T.N.'s (Claim No. 0575409271) shoulder, which does not involve any incision or wound.

324.   CHHC nevertheless billed for more than two (2) weeks of home care thereafter, charging more than $3,000 on each date service was rendered, and included charges for gauze, saline, and other supplies that could only be reasonable if the patient actually had a healing surgical wound, which T.N. did not.

325.   Even the spinal surgeries billed by MASC should not and do not always require in-home services thereafter, as the same surgeries are routinely performed by other physicians in surgery centers and hospitals without any such charges incurred.

326.   For example, T.N. (Claim No. 0575409271) underwent a cervical fusion surgery by a different physician on October 14, 2020 and it was expressly recorded thereafter that she "does not need" home therapy.

327.   Just months later, on February 22, 2021 and March 29, 2021, T.N. allegedly underwent far more minor procedures consisting of an arthroscopic shoulder surgery and a manipulation under anesthesia, respectively, and CHHC

claimed she needed extensive home therapy after these procedures and billed Allstate more than $51,000.

328.   It is not possible that T.N. was able to recover from a serious cervical fusion surgery and less than six (6) months later was rendered homebound by minor outpatient procedures on a single extremity.

329.   In particular, younger patients without significant co-morbidities routinely recover from orthopedic surgeries without the need for these special and extraordinarily expensive at-home services.

330.   As one example of the defendants' improper use and billing for these services, following D.R.'s (Claim No. 0662608736) medically unnecessary knee surgery as described *supra*, MASC referred D.R. to CHHC for home healthcare services, which billed more than $93,000 for in-home physical therapy and nursing services between September 28, 2022 and November 17, 2022.

331.   MASC made this referral despite the fact that D.R. was an otherwise healthy twenty-six (26) year old who had been reported as regularly engaging in strenuous physical activities including running on concrete and playing basketball.

332.   As such, there was no medical reason for D.R. to require in-home physical therapy following this routine outpatient right knee surgery when at most he could have had standard physical therapy (if any was needed at all) at a traditional in-office physical therapy clinic for far less cost.

333.   In another example, MASC billed Allstate for a routine outpatient arthroscopic left shoulder surgery allegedly performed on September 21, 2022 to S.T. (Claim No. 0670101484).

334.   S.T. was an otherwise healthy thirty-eight (38) year old with no co-morbidities and there was no reason that she needed in-home rehabilitation from a routine arthroscopic shoulder surgery.

335.   In an attempt to falsely justify the nearly $60,000 of in-home physical therapy and nursing services CHHC charged between September 22, 2022 and November 8, 2022, CHHC noted nonsensical factors such as "[n]eed min assist and shoulder sling to ambulate.  Has high fall risk" and "unsteady gait."

336.   Obviously, a left upper extremity injury and resulting arthroscopic surgery would not have an impact on an individual's gait or ability to walk safely.

337.   Rather, CHHC included these notes to create the appearance that in-home healthcare services were necessary when they were not.

338.   CHHC routinely "certified" in its records that patients were homebound and claimed that patients have "driving restrictions" and "need assistance for all activities."

339.   The vast majority of CHHC patients were issued disability certificates for transportation, attendant care, and household replacement services, thereby

entitling patients to free transportation to medical appointments and home assistance such that home healthcare treatment was never needed.

340. The fact that these home care services and restrictions were not needed is evidenced by the fact that patients who were allegedly provided with these services were not actually homebound and in fact regularly traveled to appointments and social engagements outside the home.

341. For example, CHHC claimed that A.A. (Claim No. 0609452602) was homebound and billed for more than $30,000 for alleged home services from September 20, 2022 through October 1, 2022, including alleged physical therapy on most dates.

342. A.A. was not homebound and in fact attended physical therapy at an outside facility on September 24, September 27, and September 29, 2022 without any documented issues.

343. Indeed, A.A. was able to perform extensive exercises at this physical therapy facility while CHHC claimed on the same dates that he was confined to his home, evidencing both that CHHC fabricated its records to create the appearance of necessity and that the services billed to A.A. were not actually necessary, if they were performed at all.

344.   Similarly, CHHC billed more than $51,000 for alleged home services to T.N. (Claim No. 0575409271) from February 23, 2021 through March 1, 2021 and again from March 30, 2021 to April 16, 2021.

345.   During the time period CHHC repeatedly claimed that T.N. was homebound and in need of home medical services, T.N. left the home for in-office evaluations on February 25, 2021 and March 31, 2021, for psychologic counseling on March 31, 2021, and for injections on April 14, 2021.

346.   Obviously, T.N. could have also obtained physical therapy services outside the home if such services were necessary at all, as evidenced by the fact that she was freely able to travel to all of her other appointments.

347.   As another example, CHHC's own report documents that M.H. (Claim No. 0656091501) missed an appointment because she was attending a medical appointment elsewhere on July 12, 2022, which confirms that CHHC actually knew its claim that M.H. was homebound was false.

348.   Similarly, CHHC reported that R.S. (Claim No. 0651751414) missed an appointment on June 1, 2022 because he was not at home and was at a family member's house, which again confirms that CHHC knew that its claim that the patient was homebound was false.

349.   Allstate is not required to pay for incredibly expensive and medically unnecessary in-home healthcare services when patients at most could engage in

regular physical therapy following routine outpatient joint procedures and is entitled to a return of the money it paid to CHHC as a direct result of these fraudulent bills.

### H.   MEDICALLY UNNECESSARY URINE DRUG TESTING

350.   As part of the defendants' predetermined treatment protocol, defendant Spine Specialists routinely ordered urine drug testing ("UDT") to permit defendant NA Labs to submit thousands of dollars of bills to Allstate for alleged drug testing, not for reasons of medical necessity.

351.   UDT was routinely ordered by Spine Specialists and billed by NA Labs Lab without regard to medical necessity and contrary to standards of care.

352.   NA Labs billed for both presumptive urine drug testing and for dozens of definitive drug tests of the same specimens on the same dates almost every time it billed Allstate, which was improper, and did so even when such testing was not ordered or was contrary to what was ordered.

353.   Pursuant to this improper practice, NA Labs billed Allstate for alleged presumptive UDT on 85 occasions from February 2021 through January 2023 using CPT code 80307 ("presumptive drug testing through the use of instrument chemistry analyzers, including immunoassay, chromatography, and mass spectrometry") and also billed for extensive definitive UDT without regard to whether such testing was ordered or medically appropriate.  *See* Exhibit 5.

354.   Presumptive drug testing typically is utilized by a medical provider to rule out illicit drug use or to confirm the presence of a particular drug class without identifying individual drugs.

355.   Presumptive drug testing is properly used in the context of pain management treatment when it is random and designed to ascertain whether patients are abusing or diverting potentially dangerous medications.

356.   Guidelines for the proper use of urine drug testing performed in the context of a physician prescribing opioid medications to treat patients for chronic pain provide that testing may be appropriate to monitor for issues such as substance abuse disorder, medication adherence, diversion, efficacy, and side effects, and provide that in order to establish the medical necessity for such testing, specific elements must be established during a clinical assessment and documented in the patient's medical record including (1) patient history, physical examination, and previous laboratory findings, (2) the patient's current treatment plan, (3) a review of the prescribed medications, and (4) a risk assessment plan.

357.   A risk assessment plan must evaluate the patient's risk potential for abuse and diversion, document that assessment, and categorize the patient as low risk, moderate risk, or high risk.

358.   The frequency of random UDT for a given patient should depend on the provider's completed risk assessment of the patient.

359.   The guidelines provide that random testing of low risk patients one (1) to two (2) times every twelve (12) months is appropriate, random testing of moderate risk patients one (1) to two (2) times every six (6) months is appropriate, and random testing of high risk patients one (1) to three (3) times every three (3) months is appropriate.

360.   In addition to never identifying whether patients were at low, moderate, or high risk of abuse, the defendants ordered drug testing that was not random and far in excess of the testing recommended even for patients at the highest risk of abuse or misuse.

361.   The defendants ordered drug testing at virtually every patient appointment, resulting in testing that far exceeded the standard of care.

362.   As one example of this practice, Spine Specialists ordered and NA Labs billed for UDT for K.S. (Claim No. 0552442709), for whom Spine Specialists prescribed the opioid Norco, sixteen (16) times in a thirteen (13) month period between December 20, 2021 and January 3, 2023.

363.   Spine Specialists never performed a risk assessment for K.S. and noted no concerns that she was abusing or diverting the medications she was prescribed.

364.   The extreme amount of urine drug testing ordered for K.S. served no medical purpose and was intended solely to generate additional billing by NA Labs,

which billed Allstate $44,275 for alleged urine drug testing with respect to patient K.S.

365.   In addition to ordering and billing for urine drug testing far more frequently than was medically appropriate, the defendants generated additional charges by billing for both presumptive and definitive drug testing of nearly every patient, even when there was no need for the definitive drug testing.

366.   Guidelines for drug testing provide that when randomized presumptive drug testing confirms an expected result, there generally is no need for further testing.

367.   Only when presumptive testing (i.e., screening) shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed, should confirmatory testing be performed.

368.   This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary.   Clinical correlation is appropriate . . . .   In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a

confirmatory test. However, if the patient disputes the unexpected findings, a confirmatory test should be done."

369. Thus, SAMHSA confirms that, at most, only unexpected initial presumptive testing results should be confirmed via further testing in the absence of a patient-specific decision otherwise from the treating provider.

370. Contrary to these guidelines, the laboratory requisition/prescription forms used by NA Labs evidence that full confirmation testing was ordered while the results of presumptive testing were still pending, which can never be medically necessary:

| Panel Name | Status | Procedure Codes | Diagnosis Codes |
|---|---|---|---|
| Drug Screen | Pending | 80307 | G89.4, M54.06, M54.07 |
| Full Confirmation Testing | Pending | | G89.4, M54.06, M54.07 |
| Hydrocodone (Vicodin, Norco, others) | Pending | | G89.4, M54.06, M54.07 |
| Validity | Pending | | G89.4, M54.06, M54.07 |

371. Spine Specialists never performed any point of care testing to screen for the presence of any illicit drug abuse or misuse of prescribed medication such that ordering definitive testing without first reviewing presumptive test results was entirely inappropriate.

372. NA Labs also billed for both presumptive testing and for performing dozens of definitive drug tests even when patients were not prescribed medications or when the medications prescribed carried no risk of abuse or misuse.

373. For example, NA Labs inexplicably billed Allstate more than $3,000 for both presumptive and definitive UDT to D.W. (Claim No. 0606721966) on

February 3, 2021, when Spine Specialists noted D.W. was not taking any medications at all.

374.    Similarly, NA Labs billed Allstate for both presumptive and definitive UDT to patient J.M. (Claim No. 0609976443) on September 29, 2021 when the only medication that Spine Specialists reported J.M. was taking was methocarbamol.

375.    Methocarbamol is a non-opioid muscle relaxant that is not a prone to abuse or diversion and thus any drug testing on that date for J.M. was entirely medically unnecessary.

376.    Allstate is not required to pay for medically unnecessary UDT that was ordered for the sole purpose of increasing the amount of bills to Allstate and not used in any way to influence treatment plans and is entitled to a return of the money it paid as a result of the defendants' fraudulent submissions.

## IX.    FRAUDULENT BILLING PRACTICES

377.    The medical records, bills, and invoices submitted to Allstate by the defendants contained standardized billing codes.

378.    Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

379.   The defendants failed to meet this responsibility and instead submitted bills to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

380.   All of the medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and HCPCS codes.

381.   By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed for corresponded to and were accurately described by the published descriptions for the CPT and HCPCS codes they chose.

382.   The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills have any meanings other than those ascribed by the AMA and the federal government, which publish CPT and HCPCS codes, respectively.

383.   Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

384.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

385.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing

any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

386.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through the U.S. Mail.

387.   The defendants knowingly submitted false, incomplete, and misleading bills to Allstate, including submitting bills that included inaccurate and inappropriate CPT and HCPCS codes for the services they allegedly provided, with the intention that Allstate rely on those bills in order to make payments to the defendants to which the defendants knew they were not entitled.

388.   Allstate relied on the bills submitted by the defendants to its detriment and was induced to make payments to the defendants to which they were not entitled as a result of the defendants' fraudulent billing practices.

A.    UPCODING

389.   Physician examinations of patients are billed using CPT codes that reflect the level of complexity involved in the examination.

390.   As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT codes for medical services that (1) were not actually performed, (2) were not performed consistent with standards of care, and (3) were wholly unwarranted and unnecessary.

391.   Moreover, the billing codes submitted to Allstate by the defendants consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

392.   The defendants routinely submitted bills to Allstate seeking payment for high-level office visits that did not occur as billed.

393.   There are five (5) levels at which an office visit/examination can be billed using CPT codes: levels one (1) through five (5), with level one (1) being the least involved examination and level five (5) being the most complex. [4]

394.   Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920."

395.   The final number that completes the five-digit CPT code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

396.   The criteria developed by the AMA to properly assign the CPT code for an initial visit/examination include the components illustrated in the chart below:

---

[4] As of January 1, 2021, CPT code 99201 was deleted, making CPT code 99202 the lowest level of complexity for office examination billing.  Spine Specialists billed Allstate for office examinations well before this change and never billed Allstate for an examination lower than CPT Code 99203.  *See* Exhibit 1.

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99201 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99202 | Expanded problem focused | Expanded problem focused | Straight forward | 10 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

397.   Reevaluation or follow-up visits/examinations are billed using a CPT code that starts with the numbers "9921."

398.   The final number that completes the five-digit CPT code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

399.   The factors considered to determine the "complexity" of medical decision making in arriving at a proper CPT code assignment for initial visits/examinations include:

|  | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **Straight forward decision making (CPT code 99201-99202)** | Minimal | Minimal or none | Minimal |
| **Low complexity decision making (CPT code 99203)** | Limited | Limited | Low |
| **Moderate complexity medical decision making (CPT code 99204)** | Multiple | Moderate | Moderate |
| **High complexity medical decision making (CPT code 99205)** | Extensive | Extensive | High |

400. The AMA has published examples of office visits that are appropriately billed using CPT code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

401. The AMA has published examples of office visits that are appropriately billed using CPT code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion.

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

402. The AMA has published examples of office visits that are appropriately billed using CPT code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

403.   The AMA has published examples of office visits that are appropriately billed using CPT code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet.  She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

404.   The patients at issue in this Complaint did not present with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

405.   Instead, at most, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints.

406.   Spine Specialists's bills were sent to Allstate with *pro forma* patient records that were always billed as level four (4) or five (5) encounters.  *See* Exhibit 1.

407.   Spine Specialists's *pro forma* patient records routinely failed to document evaluations as extensive or complex as those represented by the CPT codes included on its bills.

408.   Radden did not take detailed patient histories and routinely copied and pasted his treatment plan virtually word-for-word from past appointments.

409.   Spine Specialists's own records, in addition to being copied and pasted boilerplate language that cannot support bills for highly complex examinations, also independently confirm that detailed evaluations were not performed.

410.   For example, Spine Specialists billed for a level four (4) encounter with patient D.W. (Claim No. 0551520828) on July 13, 2020 but also reported that the encounter was a video call that lasted just ten (10) minutes from 10:00 a.m. to 10:10 a.m.

411.   Spine Specialists billed Allstate for level five (5) initial patient evaluations 84% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 1.

412.   Spine Specialists billed Allstate for level four (4) or five (5) patient reevaluations more than 95% of the time with respect to patients at issue in this Complaint.  Id.

413.   Such pervasive upcoding is designed only to increase charges submitted to Allstate.

414.   Allstate is not required to pay the defendants for fraudulently billed examinations and Allstate is entitled to repayment of all amounts it paid as a result of Spine Specialists's and Radden's fraudulent submissions.

## B.   FRAUDULENT DOUBLE BILLING

415.   The federal government instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

416.   NCCI works to ensure a provider does not bill separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

417.   Healthcare providers like the defendants have a responsibility to select and submit billing codes that accurately and truthfully identify the services performed and the complexity involved in rendering those services.

418.   The defendants failed to meet their responsibility and instead submitted claims to Allstate through the U.S. Mail using the fraudulent practice of double billing, which is used to increase the amount charged for each alleged service.

419.   As discussed in detail above, Spine Specialists and MASC routinely double billed for epidurographies and fluoroscopy on the same dates of service as injection procedures that already include charges for fluoroscopic guidance to confirm correct needle placement.

420.   By billing separately for alleged epidurographies, Spine Specialists and MASC charged Allstate an additional $1,400 per procedure, and each incidence of doing so constituted fraudulent double billing.

421.   By improperly billing separately for fluoroscopic guidance, Spine Specialists charged Allstate an additional $1,000 per procedure.

422.   MASC routinely billed separately for arthrocentesis using CPT code 20610 when billing for allegedly administering platelet rich plasma ("PRP") injections.

423.   Aspirating an injection site before injecting a drug (or PRP) is a necessary component of performing an injection and is therefore a service included in the charge amount for the primary code.

424.   When MASC billed for PRP injections, Spine Specialists also often added charges for arthrocentesis resulting in Allstate being charged three (3) times for the same component of these injection procedures.

425.   Spine Specialists also sometimes added an additional charge for ultrasonic guidance for needle placement associated with the aspiration component of PRP injections, which was particularly deceptive as the code billed by MASC for these procedures included both aspiration and needle guidance.  *See* Exhibit 1.

426.   For example, MASC billed Allstate for a PRP injection to L.J. (Claim No. 0452088917) using CPT code 0232T (which includes image guidance, harvesting, and preparation) and a double-billed charge for aspiration on November 3, 2018.

427.    Spine Specialists submitted an improper bill for aspiration associated with this same procedure to L.J. that also included a charge for ultrasonic needle guidance.

428.    As detailed above, Spine Specialists also improperly billed for alleged IONM, including charges for somatosensory evoked potential studies, on nearly every bill submitted for surgeries purportedly performed by Radden.

429.    These IONM charges, in addition to being medically unnecessary and not actually performed by Spine Specialists, are services that are included in the global surgical package (discussed below) and are not separately billable.

430.    Spine Specialists also fraudulently billed for physical therapy involving modalities that are not permitted to be billed on the same dates of service to the same patient, as doing so renders the treatment redundant.

431.    Coding guidelines and regulations prohibit manual therapy (CPT code 97140) and massage therapy (CPT code 97124) from being performed on the same patient on the same date.

432.    Spine Specialists and Radden often billed for both manual therapy and massage therapy to the same patient on the same dates, and these bills were unquestionably and fraudulently double billed.  *See* Exhibit 1.

433.    CHHC also routinely billed separately for routine medical supplies such as gloves, lancets, waterproof tape, wound dressing, and gauze, all of which are

included in the already outrageously expensive charges for nursing and therapy submitted by CHHC under federal coding guidelines.

434.   Indeed, CHHC has billed Allstate more than $20,000 for these improper charges alone.  *See* Exhibit 4.

435.   Allstate is not required to pay the defendants for fraudulently double billed charges and is entitled to repayment of all amounts it paid as a result of the defendant's fraudulent submissions.

## C.   IMPROPER BILLING DURING THE GLOBAL SURGERY PERIOD

436.   Bills for surgical procedures are for "global surgical packages," which include all necessary services normally furnished by a surgeon before, during, and after a procedure.

437.   The amount of post-surgical treatment covered by the bill for the surgery varies between procedures, but is either ten (10) days or ninety (90) days.

438.   Pain management injections billed by the defendants also have global packages that cover all evaluations and services performed on the day of the procedure.

439.   The prohibition against billing for follow-up visits within the global period includes for post-surgical pain management, and is applicable to different physicians within the same practice group as the physician who performed the surgery.

440.   Surgeries billed by the defendants that are subject to global surgical packages with periods of post-surgical follow-up visits include:

| CPT Code | Description | Global Period |
|---|---|---|
| 23020 | Release shoulder joint | 90 days |
| 23130 | Acromioplasty | 90 days |
| 23410 | Repair of rotator cuff | 90 days |
| 29823 | Arthroscopy of the shoulder | 90 days |
| 29870 | Diagnostic knee arthroscopy | 90 days |
| 29873 | Arthroscopy of the knee | 90 days |
| 29875 | Arthroscopy of the knee | 90 days |
| 29876 | Arthroscopy of the knee | 90 days |
| 29877 | Arthroscopy of the knee | 90 days |
| 29879 | Arthroscopy of the knee | 90 days |
| 29880 | Arthroscopy of the knee | 90 days |
| 29881 | Arthroscopy of the knee | 90 days |
| 29895 | Arthroscopy of the ankle | 90 days |
| 29897 | Arthroscopy of the ankle | 90 days |
| 63050 | Cervical laminoplasty | 90 days |
| 63056 | Spinal cord decompression | 90 days |
| 63075 | Cervical disc surgery | 90 days |
| 63650 | Neuroelectrode implantation | 10 days |
| 64555 | Neuroelectrode implantation | 10 days |
| 64633 | Radiofrequency ablation | 10 days |
| 64635 | Radiofrequency ablation | 10 days |

441.   The global surgery period applies to charges submitted by all physicians and/or other qualified healthcare professionals of the same group who submit bills using the same federal taxpayer identification number ("TIN").

442.   The following post-surgery services are included in the global surgery package:

- All additional medical or surgical services required of the surgeon during the post-operative period of the surgery because of complications, which do not require additional trips to the operating room.

- Follow-up visits during the post-operative period of the surgery that are related to recovery from the surgery.

- Post-surgical pain management by the surgeon.

- Supplies, except for those identified as exclusions.

- Miscellaneous services, such as dressing changes, local incision care, removal of operative pack, removal of cutaneous sutures and staples, lines, wires, tubes, drains, casts, and splints; insertion, irrigation, and removal of urinary catheters, routine peripheral intravenous lines, nasogastric and rectal tubes, and changes and removal of tracheostomy tubes.

443. The defendants routinely disregarded the post-surgical global period, and repeatedly submitted charges to Allstate for surgical follow-up visits that were included in the bill for the surgery itself.

444. For example, Spine Specialists, MASC, and Radden billed Allstate for cervical disc surgery on patient L.S. (Claim No. 0587222950) using CPT code 63075 on September 25, 2020.

445. The global period of CPT Code 63075 is 90 days, which ended on December 24, 2020.

446. Prior to that date, Spine Specialists billed two (2) follow-up exams dated November 9, 2020 and December 23, 2020 that were both clearly devoted to

the recovery of the cervical spine and, therefore, were included in the global surgical package.

## X.   UNREASONABLE AND UNCUSTOMARY CHARGES

447.   The amounts the defendants charged to Allstate were far above reasonable and customary prices for the treatment and services allegedly rendered.

448.   Michigan courts have stated explicitly that "medical care providers are prohibited from charging more than a reasonable fee."  McGill v. Auto. Ass'n, 526 N.W.2d 12, 14 (Mich. Ct. App. 1994).

449.   The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder.  Mich. Comp. Laws § 500.3107(1)(a).

450.   For the reasons discussed *infra*, the defendants cannot meet their burden of showing that their charges are reasonable, thereby vitiating Allstate's obligation to pay any of the unreasonable charges for surgical procedures, anesthesia, and home healthcare treatment, and entitling Allstate to restitution for those amounts paid that are in excess of a reasonable amount for the services purportedly rendered.

451.   Spine Specialists, MASC, Anesthesia Services, and CHHC billed Allstate at rates that far exceed what can be considered reasonable and customary.

452.   Each of the purported spinal surgeries billed by Spine Specialists, MASC, Anesthesia Services Affiliates, and Radden and the additional unnecessary home health treatment that followed billed by CHHC resulted in hundreds of

thousands of dollars of unreasonable charges submitted by the defendants and their co-conspirators.

453.   The following chart documents the charges submitted relative to a single outpatient lumbar procedure to patient L.S. (Claim No. 0587222950)  on April 23, 2021:

| Provider | Bill Amount |
|---|---|
| Spine Specialists | $57,400 |
| MASC | $166,042 |
| Anesthesia Services Affiliates | $25,000 |
| IONM | $23,620 |
| CHHC | $33,644 |
| Total Charges | **$305,706** |

454.   Each of the routine outpatient surgeries billed by the defendants resulted in unreasonable charges that were driven by the defendants' outrageous bill amounts, extensive double and triple billing, and billing for services not rendered.

455.   For several of the procedures at issue herein, the defendants caused even more charges to be submitted, including for unnecessary surgical assistants, home care, and follow-up evaluations within the global period, as detailed *supra*.

456.   The defendants' unreasonable charge amounts and billing practices led to total bill amounts that were many times higher than what other providers charge for the same procedures.

457.   For example, a study published in 2018 found that the nationwide average cost of cervical disc replacement procedures was $13,197, which is just four

percent (4%) of the amounts routinely billed by the defendants.  *See* Comron Saifi M.D., *et al.*, *Trends in resource utilization and rate of cervical disc arthroplasty and anterior cervical discectomy and fusion throughout the United States from 2006 – 2013*, 18 THE SPINE JOURNAL 1022-1029 (2018).

458.   Similarly, an article published in August 2017 surveyed the costs of lumbar laminectomies for 181,267 patients throughout the country, and found that the average cost was $11,405, which is just three percent (3%) of the amounts routinely billed by the defendants.  Corinna C. Zygourakis, M.D., *et al.*, *Geographic and Hospital Variation in Cost of Lumbar Laminectomy and Lumbar Fusion for Degenerative Conditions*, 81 NEUROSURG 331-340 (2017).

459.   As discussed above and detailed by Exhibits 1 through 5 annexed hereto, the defendants' charges for the same or similar procedures were nearly always twenty (20) to thirty (30) times these amounts.

460.   For example, Spine Specialists, MASC, and Anesthesia Services collectively billed Allstate a total of $210,717 for an arthroscopic rotator cuff surgery allegedly performed on patient T.J. (Claim No. 0610401846) on November 15, 2021.

461.   An article published in October 2019 surveyed the costs of arthroscopic shoulder rotator cuff repair surgery for 40,618 patients throughout the country, and found that the average cost of this surgery was $25,353.  Lambert Li, *et al.*, *The*

*primary cost drivers of arthroscopic rotator cuff repair surgery: a cost-minimization analysis of 40,618 cases*, 28 JOURNAL OF SHOULDER AND ELBOW SURGERY 1977-1982 (2019).

462.   These egregious charges were further compounded by the addition of medically unnecessary home healthcare charges by CHHC that added another $40,899 to the already outrageous bill for T.J. over the following two (2) weeks.

463.   To that end, CHHC routinely billed Allstate for every patient more than $2,110 using HCPCS code G0151 for physical therapy services and $3,262 for nursing services using HCPCS code G0299, often on the same date of purported service resulting in a massive total of over $5,372 for a single date of alleged treatment.

464.   In contrast, according to data published by the federal government for 2021, Medicare paid home healthcare clinics an average of $230 for a single home healthcare date of service nationwide.

465.   Even on the dates when CHHC charged only $2,110, charging nearly ten (10) times the average payment from Medicare is *per se* unreasonable.

466.   The amounts of the defendants' charges have no relationship to the cost or value of the services allegedly performed, and they were selected only to maximize the amount of charges to Allstate.

467.   Anesthesia Services's rates for general anesthesia services also far exceed what is reasonable and customary.

468.   As just one example, Anesthesia Services charged $3,000 for allegedly administering twenty-three (23) minutes of sedation to patient K.S. (Claim No. 0552442709) on June 6, 2023.

469.   The federal government uses the following formula to determine the payment for timed anesthesia services:  base units + time (in units) x conversion factor ("CF") = anesthesia fee amount.

470.   The base unit value corresponding to CPT code 01938 is four (4) and the CF value for the Detroit Michigan area is 21.97.

471.   Anesthesia Services billed Allstate for six (6) units of timed sedation lasting only twenty-three (23) minutes.

472.   Using the federal formula, if six (6) units were properly charged, the payment amount would be $307.58.

473.   Charging nearly ten (10) times more than the amounts paid by other payors is *per se* unreasonable and excessive.

474.   Allstate is not obligated to pay any pending bills for procedures, home healthcare treatment, and anesthesia billed at excessive amounts, and it is entitled to restitution for the alleged procedures and services for which it has already tendered payment.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

475.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

476.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

477.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

478.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

479. There are no less than eleven (11) separate reasons why the defendants'
alleged treatment was not in fact performed, was not lawful, was not medically
necessary, and was fraudulently billed to Allstate:

a. Spine Specialists, MASC, and NA Labs routinely billed for services
   that were not performed at all.

b. The defendants falsified and exaggerated medical findings and patients'
   symptoms to justify performance of medically unnecessary services,
   including surgeries, use of surgical suites, injection treatment,
   administration of anesthesia, home healthcare treatment, and UDT, and
   to falsely create the appearance of injuries.

c. The defendants obtained patients through unlawful solicitation and
   improper referrals.   The defendants engaged in *quid pro quo*
   relationships with personal injury attorneys to establish a supply of
   patients for their fraudulent scheme.   The defendants' methods of
   obtaining patients and making referrals to each other did not include
   considerations of medical necessity.

d. Spine Specialists, MASC, Anesthesia Services, and Radden billed for
   medically unnecessary injections and surgical procedures in violation
   of applicable standards of care.

e. CHHC billed for medically unnecessary home healthcare treatment to
   patients who had minor arthroscopic surgeries and did not need such
   intensified and expensive treatment.

f. NA Labs billed for UDT that was excessive, predetermined, medically
   unnecessary, and not actually used in any way to guide patient care or
   medical decision-making.

g. The defendants used an improper predetermined treatment protocol,
   implemented by use of vague findings and predetermined diagnoses, to
   order and bill for unnecessary and excessive services and testing.

h. Spine Specialists and Radden fraudulently upcoded office visits and submitted charges for office visits that were included in global post-surgery periods.

i. Spine Specialists, MASC, and Radden routinely double billed, and often triple billed, for components of purported procedures.

j. Spine Specialists, MASC, Anesthesia Services, and Radden billed for unnecessary services ancillary to purported procedures, including intraoperative neuromonitoring and monitored anesthesia care, that were improper, medically unnecessary, and done only to multiply the total amount the defendants billed to Allstate.

k. The defendants charged Allstate grossly unreasonable and uncustomary amounts.

480. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

481. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

482. The foregoing facts – including billing for services not rendered, forging and falsifying medical records, using a predetermined treatment protocol to generate charges for unnecessary services, and misrepresenting the necessity of treatment, testing, and facility fee services – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

483. The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful.

484. The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 5.

485. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

486. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

487. Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, UDT, and ancillary services for which they billed Allstate.

488.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

**B.   ALLSTATE'S JUSTIFIABLE RELIANCE**

489.   The documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

490.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

491.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

492.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

493.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and

could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

494.   As a result of and in reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

495.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

496.   As a result, Allstate has incurred costs in adjusting the insurance claims submitted by the defendants and paid money to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.   **MAIL FRAUD RACKETEERING ACTIVITY**

497.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

498.   The objective of the scheme to defraud Allstate, which occurred throughout the period set out in Exhibits 1 through 5, was to collect No-Fault payments to which the defendants were not entitled because the medical services provided, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

499.   This objective necessarily required the submission of bills for payment to Allstate.

500.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

501.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

502.   It was foreseeable to the defendants that submitting bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

503.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

504.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

505.   A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 6.

506.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be

submitted to Allstate via mail related to each exemplar patient discussed in this Complaint.

507.   It was within the ordinary course of business for Spine Specialists, MASC, Anesthesia Services, CHHC, and NA Labs to submit claims for No-Fault payment to insurance carriers like Allstate through the U.S. Mail.

508.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via the U.S. Mail.

509.   In other words, discrete (claim- and patient-specific) instances of mail fraud are a regular way of doing business for each of the entity defendants.

510.   The entity defendants, at the direction and with the knowledge of their owners and managers (including defendant Radden), continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

511.   Thus, the defendants' commission of mail fraud continues.

512.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

513.   Allstate reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 through 5 annexed hereto and identified in the exemplar claims above.

514.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII.  **DAMAGES**

515.   The wrongful conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

516.   For the reasons set forth in this Complaint, Allstate seeks compensatory damages against the defendants for the amounts Allstate has paid to them and paid because of them and their conduct.

517.   Every payment claimed by Allstate as damages was made by Allstate alone.

518.   Moreover, every payment made by Allstate derives from a check sent by Allstate to the defendants through the U.S. Mail.

519.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed medical records and bills

for the purpose of having Allstate rely on such documents and mail payment in response thereto.

520.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

521.   The total damages sought by Allstate by this Complaint exceeds the amount of $75,000 against each defendant.

522.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  CAUSES OF ACTION

### COUNT I
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Spine Specialists Enterprise)**
**Against Michigan Ambulatory Surgical Center, LLC; Anesthesia Services Affiliates, P.L.L.C.; Central Home Health Care, Inc.; North American Laboratories, L.L.C.; and Louis Radden, D.O.**

523.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

524.   Spine Specialists constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

525. In connection with each of the claims identified in the within Complaint, defendants MASC, Anesthesia Services, CHHC, NA Labs, and Radden ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Spine Specialists, or knew that such false medical documentation would be mailed in the ordinary course of Spine Specialists's business, or should have reasonably foreseen that the mailing of such false medical documentation by Spine Specialists would occur, in furtherance of the Count I defendants' scheme to defraud.

526. The Count I defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 6.

527. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Spine Specialists, which they knew would be billed by Spine Specialists, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

528. Radden owned, managed, and controlled Spine Specialists and was responsible for all actions taken by Spine Specialists and its staff.

529.   MASC was responsible for supplying goods, services, and the facility for the medically unnecessary treatment that allowed Spine Specialists to submit bills to Allstate for medically unnecessary procedures.

530.   Anesthesia Services was responsible for supplying anesthesia services that allowed Spine Specialists to implement its predetermined treatment protocol and increase the amount of unnecessary charges it was able to generate for each patient and thereby submit bills for medically unnecessary procedures.

531.   CHHC submitted bills for medically unnecessary home healthcare treatment, which created the appearance of injury to Spine Specialists's patients and support for bills submitted by Spine Specialists.

532.   NA Labs billed Allstate for medically unnecessary UDT that was used to create the appearance that Spine Specialists was performing lawful and necessary treatment to the patients at issue herein and that gave the false appearance that patients needed treatment from Spine Specialists that allowed Spine Specialists to continue billing Allstate.

533.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Spine Specialists to continue billing for unlawful and medically unnecessary treatment.

534. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Spine Specialists for the benefit of the Count I defendants that would not otherwise have been paid.

535. The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

536. By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Spine Specialists Enterprise)
### Against Michigan Ambulatory Surgical Center, LLC; Anesthesia Services Affiliates, P.L.L.C.; Central Home Health Care, Inc.; North American Laboratories, L.L.C.; and Louis Radden, D.O.

537. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

538. Defendants MASC, Anesthesia Services, CHHC, NA Labs, and Radden ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Spine Specialists.

539. The Count II defendants each agreed to further, facilitate, support, and operate the Spine Specialists enterprise.

540. As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

541. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Spine Specialists even though Spine Specialists was not eligible to collect such payments by virtue of its unlawful conduct.

542. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

543. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

544. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
## (MASC Enterprise)
## Against Spine Specialists of Michigan, P.C.; Anesthesia Services Affiliates, P.L.L.C.; and Louis Radden, D.O.

545.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

546.   MASC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

547.   In connection with each of the claims identified in the within Complaint, defendants Spine Specialists, Anesthesia Services, and Radden ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation by MASC, or knew that such false medical documentation would be mailed in the ordinary course of MASC's business, or should have reasonably foreseen that the mailing of such false medical documentation by MASC would occur, in furtherance of the Count III defendants' scheme to defraud.

548.   The Count III defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 6.

549.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility fees by MASC, which they knew would be billed

by MASC, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

550. Radden owned, managed, and controlled MASC and was responsible for all actions taken by MASC and its staff.

551. Spine Specialists was responsible for ordering medically unnecessary injections and procedures and arranging for those unnecessary injections and procedures to be performed at MASC in order to allow MASC to submit bills to Allstate for medically unnecessary facility fees.

552. Anesthesia Services was responsible for supplying anesthesia services ordered by Spine Specialists and provided at MASC that allowed MASC to be able to submit bills for medically unnecessary facility fees.

553. The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted MASC to continue billing for unlawful and medically unnecessary treatment.

554. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to MASC for the benefit of the Count III defendants that would not otherwise have been paid.

555.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

556.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT IV**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(MASC Enterprise)**
**Against Spine Specialists of Michigan, P.C.; Anesthesia Services Affiliates, P.L.L.C.; and Louis Radden, D.O.**

557.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

558.   Defendants Spine Specialists, Anesthesia Services, and Radden ("Count IV defendants") conspired to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of MASC.

559.   The Count IV defendants agreed to further, facilitate, support, and operate the MASC enterprise.

560.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

561. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of MASC even though MASC was not eligible to collect such payments by virtue of its unlawful conduct.

562. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

563. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

564. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are liable to Allstate and Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT V</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Anesthesia Services Enterprise)**
**Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.**

565. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

566.   Anesthesia Services constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

567.   In connection with each of the claims identified in the within Complaint, defendants Spine Specialists, MASC, and Radden ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation by Anesthesia Services, or knew that such false medical documentation would be mailed in the ordinary course of Anesthesia Services's business, or should have reasonably foreseen that the mailing of such false medical documentation by Anesthesia Services would occur, in furtherance of the Count V defendants' scheme to defraud.

568.   The Count V defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 6.

569.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for services that were purportedly provided by Anesthesia Services, which they knew would be billed by Anesthesia Services, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

570.   Radden owned, managed, and controlled Anesthesia Services and was responsible for all actions taken by Anesthesia Services and its staff.

571.   Spine Specialists was responsible for ordering medically unnecessary injections and procedures and arranging for Anesthesia Services to provide the unnecessary and dangerous anesthesia during these injections and procedures in order to allow Anesthesia Services to submit bills to Allstate for medically unnecessary anesthesia.

572.   MASC was responsible for providing the facility and supplies for Anesthesia Services that allowed Anesthesia Services to submit bills for medically unnecessary and dangerous anesthesia.

573.   The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Anesthesia Services to continue billing for medically unnecessary anesthesia.

574.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Anesthesia Services for the benefit of the Count V defendants that would not otherwise have been paid.

575.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

576.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c),

Allstate is entitled to recover from them three times the damages sustained by reason

of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including

reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Anesthesia Services Enterprise)**
**Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory**
**Surgical Center, LLC; and Louis Radden, D.O.**

577.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 522 set forth above as if fully set forth herein.

578.   Defendants Spine Specialists, MASC, and Radden ("Count VI

defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the

facilitation of the operation of Anesthesia Services.

579.   The Count VI defendants each agreed to further, facilitate, support, and

operate the Anesthesia Services enterprise.

580.   As such, the Count VI defendants conspired to violate 18 U.S.C. §

1962(c).

581.   The purpose of the conspiracy was to obtain insurance payments from

Allstate on behalf of Anesthesia Services even though Anesthesia Services was not

eligible to collect such payments by virtue of its unlawful conduct.

582.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

583.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

584.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(CHHC Enterprise)**
**Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.**

585.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

586.   CHHC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

587.   In connection with each of the claims identified in the within Complaint, defendants Spine Specialists, MASC, and Radden ("Count VII defendants") intentionally caused to be prepared and mailed false medical documentation by CHHC, or knew that such false medical documentation would be mailed in the ordinary course of CHHC's business, or should have reasonably foreseen that the mailing of such false medical documentation by CHHC would occur, in furtherance of the Count VII defendants' scheme to defraud.

588.   The Count VII defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 6.

589.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for alleged home healthcare treatment that was purportedly provided by CHHC, which they knew would be billed by CHHC, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

590.   Spine Specialists and Radden were responsible for ordering medically unnecessary procedures and surgeries and arranging for those unnecessary procedures and surgeries to be performed at MASC, the patients of which were then referred to CHHC to bill Allstate for medically unnecessary home healthcare treatment.

591. MASC submitted bills for medically unnecessary procedures and surgeries, following which those patients were referred to CHHC for medically unnecessary home healthcare.

592. The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted CHHC to continue billing for medically unnecessary home healthcare treatment.

593. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to CHHC for the benefit of the Count VII defendants that would not otherwise have been paid.

594. The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

595. By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(CHHC Enterprise)**
**Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical**
**Center, LLC; and Louis Radden, D.O.**

596.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

597.   Defendants Spine Specialists, MASC, and Radden ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of CHHC.

598.   The Count VIII defendants each agreed to further, facilitate, support, and operate the CHHC enterprise.

599.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

600.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of CHHC even though CHHC was not eligible to collect such payments by virtue of its unlawful conduct.

601.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

602.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

603.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (NA Labs Enterprise)
### Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.

604.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

605.   NA Labs constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

606.   In connection with each of the claims identified in the within Complaint, defendants Spine Specialists, MASC, and Radden ("Count IX defendants") intentionally caused to be prepared and mailed false medical documentation by NA Labs, or knew that such false medical documentation would

112

be mailed in the ordinary course of NA Labs's business, or should have reasonably foreseen that the mailing of such false medical documentation by NA Labs would occur, in furtherance of the Count IX defendants' scheme to defraud.

607.   The Count IX defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 6.

608.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for UDT that was purportedly performed by NA Labs, which they knew would be billed by NA Labs, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

609.   Spine Specialists and Radden ordered medically unnecessary UDT for patients and referred the same to NA Labs so NA Labs could bill for medically unnecessary UDT (if performed at all).

610.   MASC billed for medically unnecessary procedures that created the appearance that patients' purported injuries were more severe than they actually were, thereby allowing Spine Specialists to continue billing for medically unnecessary treatment including unnecessary orders for UDT to be billed by NA Labs.

611.   The Count IX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted NA Labs to continue billing for unlawful and medically unnecessary treatment.

612.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to NA Labs for the benefit of the Count IX defendants that would not otherwise have been paid.

613.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

614.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT X</u>**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(NA Labs Enterprise)**
**Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.**

615.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

616.   Defendants Spine Specialists, MASC, and Radden ("Count X defendants") conspired to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of NA Labs.

617.   The Count X defendants agreed to further, facilitate, support, and operate the NA Labs enterprise.

618.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

619.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of NA Labs even though NA Labs was not eligible to collect such payments by virtue of its unlawful conduct.

620.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

621.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

622.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are liable to Allstate and Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf of

the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## COMMON LAW FRAUD
### Against All Defendants

623.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

624.   The scheme to defraud perpetrated by Spine Specialists, MASC, Anesthesia Services, CHHC, NA Labs, and Radden ("Count XI defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

625.   The misrepresentations of fact made by the Count XI defendants include those material misrepresentations discussed in section XI.A, *supra*.

626.   The Count XI defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

627.   The misrepresentations were intentionally made by the Count XI defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

628. The Count XI defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

629. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of insurance claims submitted by the defendants.

630. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT XII**
**CIVIL CONSPIRACY**
**Against All Defendants**

631. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

632. Defendants Spine Specialists, MASC, Anesthesia Services, CHHC, NA Labs, and Radden ("Count XII defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide

reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

633. The Count XII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

634. This purpose was known to all of the Count XII defendants and intentionally pursued.

635. Indeed, as detailed above, the Count XII defendants engaged in inter-referrals to each other of patients for unnecessary treatment and testing so that each could submit improper bills to Allstate.

636. Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

637. As a result of and in reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

638.   All of the Count XII defendants directly benefited from the payments made to Spine Specialists, MASC, Anesthesia Services, CHHC, and NA Labs.

639.   All of the Count XII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XII defendants in the commission of acts done for the benefit of all Count XII defendants and to the unjustified detriment of Allstate.

640.   Accordingly, all of the Count XII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<u>**COUNT XIII**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; Anesthesia Services Affiliates, P.L.L.C.; Central Home Health Care, Inc.; and North American Laboratories, L.L.C.**

641.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

642.   Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Spine Specialists, MASC, Anesthesia Services, CHHC, and NA Labs ("Count XIII defendants").

643.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XIII defendants, which misrepresented the fact,

119

reasonableness, necessity, and lawfulness of the medical services allegedly provided and whether the patient's injury arose out of a motor vehicle accident.

644.   The Count XIII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

645.   Allstate is entitled to restitution from each of the Count XIII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

646.   The Count XIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIV
## UNJUST ENRICHMENT
### Against All Defendants

647.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

648.   Defendants Spine Specialists, MASC, Anesthesia Services, CHHC, NA Labs, and Radden ("Count XIV defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' misrepresentations.

649.   Allstate's payments constitute a benefit that the Count XIV defendants aggressively sought and voluntarily accepted.

650. The Count XIV defendants wrongfully obtained or benefited from payments from Allstate through the wrongful conduct detailed herein.

651. The Count XIV defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XV
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

652. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 522 set forth above as if fully set forth herein.

653. Defendants Spine Specialists, MASC, Anesthesia Services, CHHC, NA Labs, and Radden ("Count XV defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

654. The Count XV defendants also billed for services not rendered.

655. The Count XV defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating bills to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

656. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay insurance benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident. Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

657.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

658.   The lack of lawfully-rendered treatment is also a defense to an insurer's obligation to pay No-Fault benefits.  Mich. Comp. Laws §§ 500.3157(1).

659.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

660.   The Count XV defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

661.   The Count XV defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by any of the Count XV defendants for any or all of the reasons set out in the within Complaint.

662.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants billed for

unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

663.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

664.   As such, the Count XV defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

665.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XV.  <u>DEMAND FOR RELIEF</u>

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company respectfully pray that judgment enter in their favor as follows:

<u>COUNT I</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Spine Specialists Enterprise)**
**Against Michigan Ambulatory Surgical Center, LLC; Anesthesia Services**
**Affiliates, P.L.L.C.; Central Home Health Care, Inc.; North American**
**Laboratories, L.L.C.; and Louis Radden, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Spine Specialists Enterprise)**
**Against Michigan Ambulatory Surgical Center, LLC; Anesthesia Services**
**Affiliates, P.L.L.C.; Central Home Health Care, Inc.; North American**
**Laboratories, L.L.C.; and Louis Radden, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(MASC Enterprise)**
**Against Spine Specialists of Michigan, P.C.; Anesthesia Services Affiliates,**
**P.L.L.C.; and Louis Radden, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

125

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (MASC Enterprise)
### Against Spine Specialists of Michigan, P.C.; Anesthesia Services Affiliates, P.L.L.C.; and Louis Radden, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Anesthesia Services Enterprise)
### Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Anesthesia Services Enterprise)
### Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory
### Surgical Center, LLC; and Louis Radden, D.O.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (CHHC Enterprise)
### Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical
### Center, LLC; and Louis Radden, D.O.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (CHHC Enterprise)
### Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (NA Labs Enterprise)
### Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT X
## VIOLATION OF 18 U.S.C. § 1962(d)
## (NA Labs Enterprise)
## Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; and Louis Radden, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
## COMMON LAW FRAUD
## Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' wrongful conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XII
### CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' wrongful conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XIII
### PAYMENT UNDER MISTAKE OF FACT
### Against Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; Anesthesia Services Affiliates, P.L.L.C.; Central Home Health Care, Inc.; and North American Laboratories, L.L.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIV
### UNJUST ENRICHMENT
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XV
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; Anesthesia Services Affiliates, P.L.L.C.; Central Home Health Care, Inc.; North American Laboratories, L.L.C**.,** and Louis Radden, D.O., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; Anesthesia Services Affiliates, P.L.L.C.; Central Home Health Care, Inc.; North American Laboratories, L.L.C., and Louis Radden, D.O., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)     DECLARE that Spine Specialists of Michigan, P.C.; Michigan Ambulatory Surgical Center, LLC; Anesthesia Services Affiliates, P.L.L.C.; Central Home Health Care, Inc.; North American Laboratories, L.L.C., and Louis Radden, D.O., jointly and severally, cannot balance bill or otherwise seek payment from any

person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)   GRANT such other relief as this Court deems just and appropriate under Michigan and federal law and the principles of equity.

## XVI. **JURY DEMAND**

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____

Andrew H. DeNinno
adeninno@ktmpc.com
Kevin J. Peters (P53771)
kpeters@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  July 19, 2024         *Attorneys for Allstate*